S. W. ELECTRONICS & MANUFAC-
TURING CORP.

v.

The UNITED STATES.

No. 207–78.

United States Court of Claims.

July 29, 1981.

William J. Platzer, Falls Church, Va., attorney of record, for plaintiff; Woodrow W. Storey, of counsel.

Lenore C. Garon, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and KASHIWA and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

This contract case involves an appeal from a quantum decision of the Armed Services Board of Contract Appeals. In an earlier decision, the board determined that the plaintiff (S.W. Electronics & Manufacturing Corp., sometimes referred to as Swemco) was entitled to recover damages due to the defective design specification which the Government furnished for a rotary switch that was incorporated into a radio receiving set. *S.W. Electronics & Mfg. Corp.*, ASBCA No. 17523, 74–2 BCA ¶ 10,-650 (1974) (*S.W. I*—entitlement decision). In a subsequent decision, which is the subject of this appeal, the board determined that plaintiff was entitled to recover only $2,601 of its $269,299 quantum claim. *S.W. Electronics & Mfg. Corp.*, ASBCA Nos. 20698 and 20860, 77–2 BCA ¶ 12,631 (1977) (*S.W. II*—quantum decision). The quantum decision was affirmed in an opinion based on plaintiff's motion for reconsideration. *S.W. Electronics & Mfg. Corp.*, ASBCA Nos. 20698 and 20860, 77–2 BCA ¶ 12,785 (1977) (*S.W. III*—reconsideration decision).

The board found that plaintiff had failed in its burden of proof in establishing both the government's responsibility for and the reasonableness of the quantum claimed. As part of its decision that the plaintiff had inappropriately proceeded on a total cost theory of recovery, the board found that the cost of reworking sets into which defective switches had knowingly been placed by plaintiff was not a cost attributable to the defective specification.

The quantum decision is presently before the court for review in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976). The plaintiff takes exceptions to the trial judge's decision recommending affirmance of the board opinion. We agree with the trial judge's rejection of

the total cost claim.[1] However, based on a review of the facts, we conclude that the board erred in failing to grant a "jury verdict" for plaintiff. The board misapplied the law and evidence relating to such verdicts, and we conclude that the contracting officer's award should not have been reduced since it represented a reasonable estimate of plaintiff's damages under the facts of this case.

On January 12, 1971, plaintiff was awarded contract No. NOO383–71–C–0061 by the Naval Aviation Supply Office (ASO). The ASO contract required plaintiff to manufacture and deliver 527 radio receiving sets for use in military aircraft at a contract price of $823,645. The radio receiving set is a complicated piece of electronic equipment composed of three modules of which only one, the Radio Frequency Module, is pertinent to the plaintiff's claim. That module is comprised of four subassemblies, one of which contains the rotary switch which is the source of this dispute. The rotary switch was manufactured according to specification control drawing No. 8525028/Rev. G, which was found to be part of the ASO contract in the entitlement decision in this case, S.W. I.

The problem developed several months after plaintiff began incorporating a rotary switch manufactured by Ledex, Inc. In late September of 1971, finished sets failed to pass the required electrical tests and on October 22, 1971, plaintiff notified ASO of the problem. In order to understand the setting in which these problems developed, it is necessary to consider a prior and a concurrent contract which plaintiff performed.

In June 1971, plaintiff experienced a financial crisis that threatened the company's continued existence. Plaintiff had nearly completed production of some sound rang-

ing sets for the Government of Pakistan. However, plaintiff's export license had expired and could not be renewed due to a review of the U. S. military supply policy with respect to Pakistan.

Unable to ship the sets and receive payment of the $230,690 contract price, plaintiff was threatened by an impending financial disaster. Plaintiff applied for Pub. L.No. 85–804, 72 Stat. 972 (1958), relief, and a grant and loan totaling $250,000 was agreed upon. The Office of the Comptroller of the Department of the Navy granted the relief after a determination that plaintiff's continued performance on government contracts was essential to the national defense. The amount of relief was calculated as the minimum necessary to complete the NavAir (discussed infra) and ASO contracts.

Plaintiff's petition for relief was premised upon the cash flow problem caused by the Pakistani contract and substantial savings the Government would receive if plaintiff completed production. In an August 27, 1971, letter to the Navy Contract Adjustment Board, plaintiff stated:

> Our poor present cash position increased current and future costs of manufacturing due to severe production inefficiencies resulting from layoffs of manufacturing and supporting personnel and running smaller production lots, both forced on us to conserve cash.

This relief was implemented by modification No. P00006 to the ASO contract. The modification was effective October 26, 1971, and included a release of all claims by plaintiff, arising prior to the date of the amendment, from any cause of action out of any contract with the U. S. Government.[2]

Prior to award of the ASO contract, plaintiff was performing another govern-

---

1. The court acknowledges the assistance received from the trial judge's recommended decision. However, we reach some different ultimate conclusions and therefore find it necessary to write our own opinion.

2. The board's decision in S.W. I found that this release did not bar the present claim. That

decision was not appealed. Therefore, the release issue is not before the court for review, but is only mentioned because the release and the modification to the ASO contract show that the relief was related to the government contracts which plaintiff was performing.

ment contract for the production of radio receiving sets. On June 26, 1969, plaintiff was awarded NavAir contract No. NOOO19–69–C–0678. NavAir supplied plaintiff with drawings, specifications, and two RCA models containing rotary switches supplied by Oak Manufacturing Company. It was these drawings which the board's *S.W. I* decision found to be part of the ASO contract. The NavAir contract was a mixed performance and design specifications contract. It required a first article submission and contained a clause for the correction of patent and latent defects.

In August 1970, NavAir approved plaintiff's first articles which incorporated Oak switches. When the switch problem developed in the fall of 1971, NavAir was notified on October 19, 1971. An engineering change proposal (ECP) was submitted to NavAir and approved on March 17, 1972. In approving the ECP, NavAir granted plaintiff an equitable adjustment based on the latent defect in the rotary switch specification. This equitable adjustment of $38,300 compensated plaintiff for the one-time engineering effort to solve the problem and the cost of reworking 27 ·receiving sets.

In response to plaintiff's letter of October 22, 1971, advising ASO of the switch problem, the ASO contracting officer on November 17, 1971, advised plaintiff in part as follows:

A review of the letter of 19 October 1971 indicates that the Switch Assembly problem is a result of your procurement of the Switch Assembly Component for the production units from a supplier other than the supplier [Oak Manufacturing Company] who furnished the component for the First Article.

Please be advised that the First Article, and the components thereof, as approved under contract NOOO19–69–C–0678 [the NavAir contract] shall serve as a manufacturing standard for the production articles to be delivered under contract NOO383–71–C–0061 [the ASO contract] and that substitution of components from other than that which are ·included in the approved First Article is not authorized.

Accordingly, deliveries under contract NOO383–71–C–0061 are required to continue in accordance with the contract prices and contract delivery schedule.

Thus, plaintiff was instructed that the switch problem was the result of using Ledex switches rather than the Oak switches contained in the first article. Plaintiff was ordered to proceed according to the contract, using Oak switches. Although the contracting officer's decision denied plaintiff monetary relief to which the subsequent board decision in *S.W. I* found plaintiff entitled, plaintiff was in no different position than any other government contractor who is denied an equitable adjustment by the contracting officer. According to the disputes clause, when a dispute arises the contractor is required to proceed diligently and "in accordance with the Contracting Officer's decision." Similarly, in this case, although the November 17 letter was not the contracting officer's final decision, the plaintiff was required to perform according to the contracting officer's decision. Although plaintiff persisted in its attempt to recover compensation, and ultimately prevailed, the contracting officer's instruction to use the Oak switch was not overturned.

The problem with the rotary switch drawing was really quite simple. The drawing specified that the maximum torque for the switch was 10 ounce inches. Torque is a measure of the force required to cause the switch to rotate on its axis. Unfortunately, the motor for the radio receiving set was not able to turn a switch that required a force in the upper range of the specified torque. The Oak switches were manufactured with a low torque and thus the motor turned them, but the original Ledex switches had a high torque (within the specified range) and the motor could not turn them. The November 17, 1971, letter from ASO recognized that the problem was with the Ledex switch. By letter of December 14, 1971, NavAir notified plaintiff that the torque limitation in drawing No. 8525028/Rev. G should be revised and that the Oak switch parameters should be used

as a baseline for the drawing revision. Thus, the problem was quickly recognized and correction of the drawing simply involved the lowering of the specified, maximum torque.

On January 17, 1972, plaintiff submitted an ECP to ASO requesting an equitable adjustment of $120,563 which included a claim of $82,500 for 150 days of delay. On March 7, 1972, the ASO contracting officer responded by letter to the ECP request and to an earlier (February 10) stop-work request. The letter denied the requests based on ASO's position that plaintiff was required to make a receiving set that passed the performance tests which were required prior to delivery.

Plaintiff's argument to the court attempts to expand one error by a government quality assurance representative (QAR) into a basis for recovery. Although, from the initial notice of the switch problem, the contracting officer consistently took the position that plaintiff was required to use a switch that would work, the QAR at one point acted contrary to that position. When plaintiff finally received a supply of redesigned Ledex switches that functioned and began using them in production, the QAR rejected the first 12 receivers with the new switch on May 2, 1972. When ASO learned of this error, the QAR was informed by telephone on May 4 that the units should be accepted, and that instruction was confirmed by telegram to the QAR on the same date. Thus, at most there was a 2-day period when working sets were not accepted. This isolated event, which was quickly corrected, does not establish that ASO would not accept units that worked and contained the redesigned Ledex switch. Plaintiff would have to establish an ASO policy that lasted longer than the QAR's short-lived rejection. Moreover, plaintiff is seeking damages for producing units containing the defective Ledex switch while there is no evidence that anyone ever accepted those units or that plaintiff ever believed after November 17, 1971, that those units would be accepted or their production compensable under the contract.

On May 23, 1972, the contracting officer issued his final decision denying plaintiff's claim. ASO maintained its position that plaintiff was required to produce equipment that met the performance specification and was interchangeable with the NavAir approved first article. Plaintiff appealed the contracting officer's decision to the board. In a May 23, 1974, opinion the board found the Government liable. The board found that the ASO contract included both design and performance specifications. Finding that the design aspect of the rotary switch was a mandatory consideration, the board concluded that the Government was responsible for the extra costs which plaintiff incurred as a result of the faulty design. This dispute was remanded to the contracting officer for negotiation and settlement of the quantum claim.

Plaintiff's original complaint to the board had demanded $120,563 in damages, the same amount originally requested in the ECP. After the entitlement decision, *S.W. I*, plaintiff amended its claim to seek $300,006. That amount was subsequently corrected and reduced to $269,299 because of reductions based on estimates of costs erroneously charged to the ASO contract by plaintiff and the probability that other costs which were unaccounted for were also erroneously charged to the ASO contract. In computing the claim, plaintiff simply determined from its books and records the total labor costs and deducted therefrom its bid or estimated labor price. The difference between these figures represents the excess costs which form the basis for plaintiff's claim.

After receiving plaintiff's claim, the contracting officer wrote plaintiff a letter stating that the claim was submitted on a "total cost basis" and indicating the problems in proving such a claim. The contracting officer "strongly suggested that [plaintiff] make every effort to relate quantum to causality." Approximately 1 year later, on September 17, 1975, the contracting officer characterized plaintiff's claim as "largely based on a total cost approach" and rejected the claim because "most of Swemco's in-

creased costs were not caused by the Government." The contracting officer noted that plaintiff experienced delays because of the financial problems caused by the Pakistani contract. Plaintiff incurred an operating loss of $89,110 on materials. The estimated costs of rework under the NavAir contract were found to be a better estimate of the ASO rework costs than plaintiff's total cost approach. The contracting officer, on the basis of plaintiff's in-process inspection records, determined that plaintiff was entitled to recover $20,813.63, and that liquidated damages were not assessable for 265 days of delay. On November 26, 1975, in a final decision on liquidated damages, the contracting officer assessed liquidated damages against plaintiff in the amount of $26,097. Both of these decisions were appealed to the board and decided in the *S.W. II* quantum decision.

Plaintiff's quantum claim is based on the cost of reworking 250 radio components which incorporated the defective switch. Plaintiff's president testified that these radio frequency modules were assembled during the period October 1971 through February 1972. Plaintiff's vice president testified that Swemco kept installing the old, defective Ledex switches until May of 1972.

In its quantum decision, *S.W. II*, the board noted that the plaintiff had "knowingly and intentionally incorporated defective Ledex switches into the Radio Frequency Module with the sure knowledge that the finished set could not pass required electrical tests," and that plaintiff "was so convinced that the finished set would be rejected that it did not submit these sets to in-house test stations." 77–2 BCA at 61,-217. The board also noted that in determining that plaintiff should be compensated for reworking 75 sets, the contracting officer had not determined whether the "sets or any part of them were produced prior to or after discovery of the defective switch." 77–2 BCA at 61,217.

The board decided that the plaintiff had failed in its burden of proof. In proving the government's responsibility for and the reasonableness of the quantum claimed, plaintiff had—

* * * offered only an accounting schedule, supported by an accountant's testimony, indicating what the appellant's books and records showed were the appellant's total contract costs, total contract receipts, and the appellant's claimed loss being the difference between the costs and the receipts. In effect, the proof of damage consists only of a single subtraction of contract receipts from contract expenditures. [77–2 BCA at 61,-218.]

Because the plaintiff failed to establish the quantity of units produced prior to discovery of the defective switch, the board concluded that the proof was inadequate to justify either a total cost recovery or a jury verdict approximation.

On the liquidated damages issue the board concluded that on the facts of this case where delays were caused by both parties, the board would not attempt to apportion damages but simply held that the liquidated damages provisions of the contract were annulled. The board thus denied defendant the recovery of the $26,097 assessment for liquidated damages.

The board only allowed plaintiff to recover $2,601 while the contracting officer had allowed plaintiff to recover $20,813.63. Since plaintiff may not have had warning that the contracting officer's allowance would be found excessive and that reworking costs of units produced after plaintiff discovered the defective switch would not be allowed, plaintiff was invited to submit evidence apportioning the damages and establishing the amount of the government's liability. The board stated:

* * * appellant is hereby afforded an opportunity, in a timely motion for reconsideration, to make an offer of proof demonstrating entitlement to additional recovery with respect to units produced prior to 22 October 1971. Appellant is cautioned that only clear proof directly relating to such units will be considered. A total cost claim such as that heretofore advanced will not be considered. [77–2 BCA at 61,220.]

Plaintiff moved for reconsideration requesting that a full panel of the board overrule the *S.W. II* decision. Plaintiff did not request an opportunity to present additional evidence as the board had suggested. On reconsideration, the original panel affirmed its decision and disposed of plaintiff's major arguments. On the issue of liability for the production of defective units, the *S.W. III* decision found as follows:

> The appellant contends that the Board erred in finding that the Government did not direct the production of defective sets. The appellant equates the ASO directive that it was the appellant's responsibility to do whatever was necessary in order to produce a set which satisfied the performance requirements of the contract with an order to build faulty sets.
>
> We disagree. The Government's language was plain and its meaning clear. The appellant simply was told to produce a workable set. We perceive no error in our finding. [77–2 BCA at 62,192.]

The board clearly expressed its willingness to assess damages and the reason for the small quantum of recovery in the following portion of the decision:

> We think it clear beyond any question or doubt that the appellant was entitled to recover all reasonable costs incurred as a result of its performance to the Government's latently defective drawing. The burden of proving said costs was with the appellant.
>
> The appellant relied on a total cost approach to carry the burden of proof. While this approach is acceptable under certain court-imposed conditions, the appellant's presentation founders because it did not comply with the prescribed conditions. [77–2 BCA at 62,192—62,193.]

An appeal to this court followed. On cross-motions for summary judgment, the trial judge recommended granting defendant's motion and dismissing the petition. The case is before the court on plaintiff's exceptions.

## I. *Production after Discovery of Defective Drawing*

The evidence that plaintiff continued to produce defective units until March or May of 1972 and the finding that the Government is not liable for these damages are the crux of this case.

On November 17, 1971, shortly after plaintiff discovered the defect and notified ASO, the contracting officer gave plaintiff instructions regarding its required performance. ASO's position was that the drawing which specified the range for the torque for the rotary switch was not part of the ASO contract. Therefore, ASO determined that there was no defect which required correction. Although the *S.W. I* decision found that ASO erred and that the drawing was part of the contract, the inquiry does not end at that stage. The November 17 letter also clearly instructed plaintiff not to use the defective Ledex switch which was manufactured to the upper range of the torque specified in the drawing and therefore would not function in the radio. Plaintiff was quickly advised of the source of the problem and instructed to use the Oak switch which was contained in the first article submission of the companion NavAir contract. If plaintiff had any doubt about what it was being told to do, it should have inquired. However, plaintiff does not even dispute that the contracting officer gave it clear instructions which were not followed.

■ The fact that the switch drawing was found to be part of the contract provides plaintiff with only a limited recovery in this case. Because the drawing was part of the contract, plaintiff was entitled to rely on the drawing and, therefore, the use of the Ledex switch which was manufactured in accordance with the drawing was justified. The board so held, and plaintiff was entitled to recover the reasonable damages which flowed from the defective drawing. Thus, rework costs for repairing the radios which were assembled prior to the discovery of the defect are recoverable.

■ When plaintiff continued to assemble radios incorporating the Ledex switch

after the contracting officer had instructed otherwise, the plaintiff's actions and not the drawing caused the damages. Plaintiff was instructed to use the Oak switch which would work and would result in a completed radio which could pass the required tests and would be accepted by the Government. The fact that the contracting officer had failed to recognize that the Government was liable for the plaintiff's earlier reliance on the drawing and had refused to pay damages does not alter what plaintiff was required to do thereafter. A government contractor cannot refuse to follow the contracting officer's instruction every time a contracting officer erroneously declines to admit liability for an equitable adjustment. The dispute procedure grants plaintiff an avenue for relief, but requires continued production according to the government's instructions.

If the contracting officer had refused to correct the drawing and had not given plaintiff any instructions that required plaintiff to alter its performance, plaintiff might very well have been entitled to continue to manufacture radios which did not work. However, such a holding would require a finding that the drawing overrode the requirements for performance testing which the contract contained. We simply note that even under these circumstances plaintiff would not have been able to tender radios which complied with all of the contract requirements. In any event, that situation is not this case.

Nor does this court's opinion in *Switlik Parachute Co. v. United States*, 216 Ct.Cl. 362, 573 F.2d 1228 (1978), support the plaintiff's position. Rather, that case tends to support the position that a contractor would be entitled to continue production of what the contractor believed were defective units, once the contractor had advised the Government of the problem and the Government had failed to take corrective action. In *Switlik* the Government believed that the vests which plaintiff was producing met the contract requirements and concluded that corrective action was not necessary. *Switlik* stated that under those circumstances the contractor had a right to

continue production. In this case, everyone agreed that the radios which incorporated the Ledex switch did not function. More importantly, the contracting officer instructed the plaintiff on the appropriate action to take, *i. e.*, use the Oak switch. It is clear that the reasoning in *Switlik* would not justify plaintiff's continued production using the Ledex switch on the facts of this case. Plaintiff's reliance on *Switlik* assumes that plaintiff was following the government's instructions in producing all of the defective radios, whereas plaintiff clearly was not. As the trial judge correctly found:

> The Government in this case never did direct the plaintiff to produce a defective set. The Government's position throughout (up to the SW I—entitlement decision, *supra*) was that the contract was a performance contract and it was up to the plaintiff to make sets that worked. The March 7, 1972, Government letter that refused the plaintiff's February 10, 1972, request for a stopwork order as unnecessary, in fact, invited the plaintiff to use the newly designed Ledex switches that would make the set work. The Board was absolutely right in concluding that plaintiff had no right to be compensated for repairing defective sets it had no legal right to build.

The reason that the contracting officer initially failed to correct the drawing in this case is that he denied that the drawing was part of the contract. That error does not obscure the fact that the defendant agreed that the drawing was defective, that it required production of a radio that performed and met the required tests, and that the defendant in effect corrected the drawing by instructing plaintiff to use the Oak switch and, later, giving permission to use the redesigned Ledex switch when it became available.

The board's reasoning in holding that the plaintiff was required to stop production totally is possibly misleading. Legally, the plaintiff cannot recover for defective sets which were produced contrary to the de-

fendant's instructions. Therefore, plaintiff's production after November 17, 1971, of units which incorporated Ledex switches that had to be reworked, resulted in damages which cannot be recovered. It would be more accurate to say that, as a matter of government contract law, plaintiff was required to stop production of defective units incorporating Ledex switches. The board's theory may have been erroneous but the conclusion was clearly correct: plaintiff cannot recover damages for the rework costs resulting from the production of defective units incorporating the Ledex switches that were produced after November 17, 1971.

## II. *Total Cost Theory*

Plaintiff's claim in this case is based primarily upon excess labor costs. The claim was calculated by subtracting plaintiff's bid of $123,000 for labor from the actual labor costs incurred according to plaintiff's accounting records (about $195,000, after the adjustments which were made to plaintiff's claim). The excess labor costs of about $72,000 with additions for overhead (150 to 169 percent), general and administrative expenses, and profit amounts to approximately $235,000. The remainder of plaintiff's $269,299 claim is for direct material costs and underutilized capacity.

In the excess labor portion of the claim, plaintiff obviously is seeking to recover the entire labor expense in excess of plaintiff's bid. Although plaintiff has introduced evidence to substantiate the validity of the bid, and evidence of the per unit cost of performing the preceding NavAir contract and another contract to manufacture radio receivers which was awarded subsequent to the ASO contract, this "should-have" cost evidence only substantiates the contract receipts figure which is subtracted from the cost of performance. As plaintiff's major witness on the amount and calculation of the claim stated, this claim is premised on all excess costs incurred being attributable to the switch problem. But the problem with total cost claims is that the total costs incurred must be substantiated as reasonable expenses resulting from the defective

drawing. Plaintiff has clearly relied on a "total cost theory." This court has long looked upon such a theory of recovery with disfavor and has put sharp restrictions on such claims which call upon the defendant to indemnify the plaintiff. *Boyajian v. United States,* 191 Ct.Cl. 233, 245–54, 423 F.2d 1231, 1238–44 (1970); *J. D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 86, 347 F.2d 235, 246–47 (1965); *F. H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 511, 130 F.Supp. 394, 400 (1955).

The board in this case properly measured the plaintiff's claim against the standards enunciated by this court in *WRB Corp. v. United States,* 183 Ct.Cl. 409 (1968), which established the following four criteria, all of which must be demonstrated before a total cost recovery will be permitted.

* * * (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses. [183 Ct.Cl. at 426 (citations omitted).]

*Responsibility for Added Expense.* Plaintiff's claim is for the cost of reworking the radio receivers to remove the old Ledex switches and replace them with the new redesigned switches. The testimony offered by plaintiff to support its claim indicated that substantial costs were incurred during the reworking process. It was a difficult operation and other portions of the radio could be and apparently were damaged during the reworking.

Plaintiff's continued production is important because it had a significant effect on the total costs incurred. Plaintiff's claim is for the cost of reworking 250 sets. As previously discussed, defendant is not liable for the cost of reworking radios which were assembled after November 17, 1971, and incorporated the original Ledex switches. Thus, plaintiff cannot recover the total costs incurred in the reworking process. The board was justified in finding that "appellant alone was responsible for

most * * * of the added expenses of performance." *S.W. II, supra*, 77–2 BCA at 61,219. To the extent that the board made a factual finding that most of the defective switches were incorporated after plaintiff had been notified not to continue, that factual finding is supported by substantial evidence and entitled to finality in this Wunderlich review. The court concludes that defendant is not liable for all of the added expense which plaintiff incurred and therefore plaintiff's total cost claim must fail.

To the extent that the record shows other increased costs which were caused by plaintiff and for which defendant is not liable, these damages support the conclusion that plaintiff must share the responsibility for the added expenses. While it is clear that the defective drawing caused some of the increased costs, the fact that the parties were jointly liable makes the plaintiff's total cost claim inappropriate.

*Reasonableness of Actual Costs.* In order for the court to allow plaintiff to recover on its total cost theory, it would also be necessary to find that plaintiff reasonably incurred the expense of reworking an estimated 250 units and that $269,299 is a reasonable cost for that work.

Plaintiff's original claim submitted to ASO on January 17, 1972, requested an adjustment of $120,563 in conjunction with the ECP to correct the specification for the switch. This claim included $2,872 as the cost of the additional direct manufacturing labor. Later, before the quantum hearing, plaintiff amended its claim to $269,299 of which approximately $72,000 was the cost of additional direct manufacturing labor. Thus, the labor cost which is the most important component of the claim is now 25 times the figure originally estimated early in 1972.

It is difficult to analyze the reasonableness of the costs which plaintiff claims were actually incurred without knowing the number of units reworked. However, plaintiff's brief to the trial judge conceded that the record does not establish the number of units reworked nor the cost of reworking each set.

Plaintiff claims that 250 radios were reworked. At the hearing it was fairly well established that there were about 200 radios near completion in May 1972 (and there had been no deliveries since September 1971). Since plaintiff maintains that production proceeded at a steady rate, it is difficult to believe that more than a small fraction of the 200 radios could have been assembled by November 17, 1971.

Defendant introduced evidence that in conjunction with negotiations regarding the ECP for the NavAir contract the plaintiff's officers stated that only 30 units were rebuilt under the ASO contract. These lower figures for the number of units reworked are supported by testimony that the switches were tested prior to installation in the radio receivers and that plaintiff was working around the problem as early as November 1971. This evidence indicates that the RF modules containing the switches were not being assembled into the radio receivers. Thus, less work would be involved in replacing the defective switch. The court concludes that the evidence casts substantial doubt on the reasonableness of plaintiff's actual costs claim of $269,299.

*Other Means to Determine Losses.* In order to recover on a total cost theory, *WRB Corp.* requires that the nature of the particular damages "make it impossible or highly impracticable to determine them with a reasonable degree of accuracy." 183 Ct.Cl. at 426. However, this constructive change primarily involved simply calculating the additional labor and material required to remove the defective switch and replace it. Thus, there is nothing peculiar about plaintiff's damages which make them impossible or highly impracticable to determine with a reasonable degree of accuracy.

Plaintiff performed the engineering work to correct the defect in the specification during performance under the NavAir contract. In connection with the ECP submitted to NavAir, plaintiff estimated the costs of manufacturing labor to rework 27 units to be $1,755 ($65 per unit). In its relatively contemporaneous estimate of the cost for manufacturing labor to rework the

defective units under the ASO contract, plaintiff estimated that cost at $2,872. This estimate was made in January 1972 when all units that defendant is liable for had already been assembled. Assuming the ASO estimate was computed at the NavAir rate of $65 per unit, this would mean that plaintiff had about 44 units to rework under the ASO contract. Obviously, plaintiff originally felt that it was possible to estimate the anticipated costs. However, at the hearing plaintiff argued that the actual costs more accurately reflected the appropriate adjustment. Plaintiff offered little explanation for the gross disparity between the original $2,872 estimate and the present claim for $72,000 in manufacturing labor.

■ This court concludes that the original estimates of the costs are a more accurate estimate of the costs for which defendant is liable than the total costs incurred. After performing the rework, plaintiff should have been able to produce reliable evidence of what the rework costs were and how many units were reworked. Plaintiff's failure to produce such evidence cannot be used as a basis for lessening the burden of proof. Plaintiff has not established that it was impossible or highly impracticable to determine these costs with a reasonable degree of accuracy.

*Summary.* The board did not err in rejecting plaintiff's total cost claims. Any one of the three preceding factors would be sufficient to support the board's decision.

### III. *Damages*

■ It is clear that the plaintiff has suffered damages in this case. The board's *S.W. I* entitlement decision found liability based on the fact that plaintiff in reliance on drawings supplied by defendant had produced radio units which did not perform. Plaintiff incurred expenses during the required reworking of those units, and the defendant is liable for those expenses. The quoted language from the *S.W. II* decision inviting reconsideration, and the *S.W. III* reconsideration decision, make it clear that the board was convinced that plaintiff had suffered damages due to defendant's fault. We find the record equally convincing and therefore conclude that the board's failure to award any recovery for the rework costs was arbitrary, capricious, and not supported by substantial evidence.

Although plaintiff has failed to establish its exact damages with mathematical precision, the board erred in barring recovery. As the court said in *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345 (1969):

> The ascertainment of damages, or of an equitable adjustment, is *not* an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." [189 Ct.Cl. at 257, 416 F.2d at 1358 (emphasis in original) (citations omitted).]

In this case there was sufficient evidence to enable the board to make a fair and reasonable approximation, but the board allowed no recovery for the rework costs. We therefore conclude that it was legal error for the board to overturn the contracting officer's award.

It follows from the foregoing that it was also legal error for the board to fail to enter an award for damages in the nature of a jury verdict. When confronted with the clear liability of defendant and the plaintiff's efforts to present all available evidence on damages, the board was under a heavy obligation to provide compensation. While there was "*uncertainty as to the extent of the damage,* * * * *there was none as to the fact of damage.*" (Emphasis in original.) *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 650, 532 F.2d 739, 743 (1976). As that decision held:

> " * * * there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. *The rule which precludes the recovery of uncertain damages applies to such as are not the certain result*

*of the wrong*, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." [209 Ct.Cl. at 650, 532 F.2d at 743 (emphasis in original) (citation omitted).] [*Quoting Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).]

The court is thus confronted with the problem of correcting the board's error. Since it is clear that some radios were manufactured with the Ledex switch prior to the instructions correcting the problem, plaintiff is entitled to some damages. We conclude that the contracting officer's award of $20,813.63 was a reasonable approximation of the damages which plaintiff has proved. The board erred in only adopting that portion of the contracting officer's decision which compensated plaintiff in the amount of $2,601 for the cost of acquiring the redesigned switches and a small restocking charge. The board erred in totally eliminating that portion of the contracting officer's award which compensated plaintiff for the cost of reworking the defective units for which defendant is liable.

The contracting officer's award is a "fair and reasonable approximation" of damages under *WRB Corp. v. United States*, 183 Ct.Cl. at 425, and could therefore have served as a basis for a "jury verdict" by the board. *See also Inland Container, Inc. v. United States*, 206 Ct.Cl. 478, 494, 512 F.2d 1073, 1082 (1975); *F. H. McGraw & Co. v. United States*, 131 Ct.Cl. at 510, 130 F.Supp. at 399. We therefore reinstate the contracting officer's award as our judgment in this case. In so doing, we note that the defendant urged that the contracting officer's award be affirmed when plaintiff appealed to the board.

We realize that we are being liberal with regard to the burden of proof required, but the facts of this unique situation on appeal fully justify the holding in this case. We are satisfied that the plaintiff is not being overcompensated for the damage that it suffered. To the extent that our judgment does not fully compensate the plaintiff, its failure to recover more is the result of its reliance on a total cost theory of proving damages. Total cost evidence is of little value when it is determined that the defendant is only liable for a portion of the plaintiff's losses. One part of the plaintiff's response brief to the trial judge is particularly illustrative of the small portion of plaintiff's losses which may actually be attributable to the defective drawing. At page 22, the brief states that "[i]f the ASO had promptly approved the design change, * * * there would have been little or no rework costs to charge to ASO (not more than 19 sets, * * *)." When that figure of 19 sets is compared with the total cost claim based on reworking approximately 250 sets, the total cost evidence becomes almost worthless. However, the total cost evidence in this particular case does supply some evidence of the damages for which defendant is liable, and the contracting officer's award is a reasonable approximation of the damages which plaintiff has proven.

## CONCLUSION

Plaintiff's motion for summary judgment is granted in part and defendant's motion is granted in part. An award of damages in the nature of a jury verdict is granted to plaintiff, increasing the award made by the Armed Services Board of Contract Appeals from $2,601 to $20,813.63.