**C. MOURER CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–107C.

United States Claims Court.

July 2, 1991.

Dale R. Martin, Seattle, Wash., for plaintiff. Gregory R. Harris, of counsel.

Deborah A. Bynum, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Joan M. Bernott on the briefs and at argument. John Breiling, Portland Dist. Corps of Engineers, Portland, Ore., of counsel.

ORDER

NETTESHEIM, Judge.

This government contract accounting case is before the court after argument on

defendant's motion for summary judgment. The issue is whether plaintiff has received payment for all of its allowable costs, so as to render it ineligible for an equitable adjustment.

## FACTS

The following facts are without substantial dispute or have been conceded for purposes of summary judgment. The Mount St. Helens volcanic eruption on May 18, 1980, created long-term erosion and sediment problems in the area's rivers by denuding thousands of acres of forest in the State of Washington. In an effort to counter the effects of the eruption, the Department of the Army, Portland District, Corps of Engineers (the "Corps") awarded over 100 contracts from 1980 to 1990.

On September 27, 1985, the Corps awarded one such contract, No. DACW57–85–C–0146, to C. Mourer Construction, Inc. ("plaintiff"). Plaintiff was to dredge the Toutle River to create three settling basins that would trap volcanic ash sediment, thereby preventing any aggradation in downstream areas which could adversely impact navigation. The contract was priced at $4,807,400.00 and contemplated plaintiff's excavating from the river channel an estimated amount of sediment, river boulders, and debris totalling 4,300,000 cubic yards ("c.y.").[1] The dredged material was to be placed within defined disposal areas. All work was to be completed before March 31, 1986.

The area encompassing these basins is referred to in the contract as "LT–3," with "LT" representing the Lower Toutle River.[2] The three basins were to be dredged to a level indicated in the contract's drawings, unless plaintiff encountered impenetrable strata or bedrock before reaching the planned level. In such a case, plaintiff was not to remove the strata or bedrock.

The contract described the undesirable materials to be excavated as "volcanic ash, sand, gravel, cobbles, and boulders, silt, alluvial materials, stumps, logs, snags, and miscellaneous debris...." If, during the course of the contract, the river deposited any sediment, called "infill material," in a completed basin, plaintiff was not to extract the newly deposited material.

Before bidding the contract, plaintiff's president, Charles C. Mourer, observed and analyzed the LT–3 area by flying over it, walking it, and reviewing specifications and plans. Plaintiff received its notice to proceed on September 30, 1985. The contract mandated initiation of contract performance within ten calendar days thereafter.

Plaintiff began mobilizing equipment to the project site on or about September 23, 1985, and started excavating on October 1, 1985. During excavation plaintiff claims that it encountered differing site conditions in the form of impenetrable strata in areas and at elevations not discernible from the contract documents. Plaintiff advised the Corps that these differing site conditions made excavation more difficult and expensive and also caused a substantial increase in equipment breakdown. At first, the Corps contended that plaintiff was encountering only a thin, hardened layer of "crust" and that it should continue ripping through the crust in order to reach more extractable material. Plaintiff complied. However, on January 2, 1986, the Corps reversed itself and, pending review of the situation, directed plaintiff to cease operations in the impenetrable areas. Plaintiff completed the channel excavation work on or about January 24, 1986, when it reached impenetrable strata in all three basins. Upon completion plaintiff immediately terminated all employees except mechanics and office personnel.

Due to the cessation of excavation earlier than anticipated, the basins lacked adequate storage space. Accordingly, in late January 1986, the Corps invited plaintiff to submit a price proposal for excavating infill material that had settled in the basins dur-

---

1. Plaintiff's bid price was a sum of two subtotals: $184,900.00 for mobilization and demobilization costs and $4,622,500.00 for channel excavation. The latter figure was arrived at by multiplying 4,300,000 c.y times a unit price of $1.075.

2. Pursuant to a preceding contract, plaintiff dredged the "LT–1" area of the Toutle River.

ing construction. The parties eventually entered into Contract Modification No. P00003, which took effect on February 11, 1985. This modification expressly amended language in the original contract precluding plaintiff from removing any infill material. The modification also stated that plaintiff was to construct a diversion dike and contemplated the removal of 800,000 c.y. of material. The negotiated price totalled $1,152,000.10. Plaintiff completed this infill excavation work on or about March 28, 1986. It expended roughly $30,-000.00 in demobilization and cleaning up activities in April and May 1986.

The actual quantity of sediment removed from the three basins in the channel excavation portion of the work totaled 2,385,325 c.y. This amount represents only 55.5 percent of the contract's estimated quantity of 4,300,000 c.y. Contract Clause 6, which embodies Federal Acquisition Regulation ("FAR") § 52.212–11, 48 C.F.R. § 52.212–11 (1984), provides for an equitable adjustment in such a situation. The regulation states, in pertinent part:

> If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. . . .

Accordingly, by letter dated July 7, 1986, plaintiff made one claim for an equitable adjustment. At the request of the contracting officer, plaintiff resubmitted the July 7 letter as two claims in a letter dated July 18, 1986. These claims were certified on December 31, 1986. Specifically, plaintiff sought one equitable adjustment in the amount of $496,928.00 for "unabsorbed costs" resulting from the quantity underrun and another in the amount of $1,176,-893.00 for increased equipment costs resulting from the differing site condition.

In an audit dated November 13, 1986, the Corps questioned $223,714.00 of the amount requested for unabsorbed costs. This amount represented, *inter alia*, mo-

nies paid as excessive officer salary instead of as distribution of profits.

Negotiations ensued concerning the amount for the quantity underrun claim. Since the parties could not reach a mutually agreeable price, the Corps issued unilateral Modification No. P00004 in the amount of $111,800.00. This modification was undated.

Concerning the differing site condition claim, no action was taken by the Corps until Contracting Officer Scott Krohn requested an audit of the claim on May 6, 1988. Even though Mr. Krohn requested that the audit be completed by July 1, 1988, the audit report did not issue until February 9, 1989. This audit covered the differing site condition claim, as well as the unabsorbed costs claim audited previously. The audit concluded that plaintiff realized $3,891,432.00 in total costs. The Corps questioned $175,739.00 of the contractor's claim in this audit. Of this amount the audit asserted that $150,000.00 claimed as officer salary was classified more properly as distribution of profits. The audit did not question equipment repair costs.

Contracting Officer R.R. Goodel issued his final decision on April 17, 1989. However, due to the submission of new information by plaintiff, the contracting officer withdrew this decision on July 14, 1989. After a re-examination of the claim, Lt. Col. Goodel issued another final decision dated March 8, 1990, in which he stated in part:

> [O]ur position has been that we differ with you on liability as to the differing site condition, but that we agree with you as to the liability on the underrun claim. It has been on the cost part of your underrun claim that we have been in disagreement.
>
> Upon extensive re-examination of both claims, we still do not agree with your differing site condition claim. But this denial is effectively moot because, on the basis of the audit work completed in recent months, we are awarding you a total cost settlement on the underrun claim, due to the peculiar circumstances of your contract. Since only one total cost settle-

ment is allowable per contract, the denial of the differing site claim is moot and immaterial now. A total cost settlement precludes double recovery on any other claim.

In a related matter, because of plaintiff's alleged violations of the Davis–Bacon Act, ch. 411, 46 Stat. 1494 (1910) (codified as amended at 40 U.S.C. §§ 276a to 276a–5 (1988)), and the Contract Work Hours and Safety Standards Act, tit. I, 76 Stat. 357 (1962) (codified as amended at 40 U.S.C. §§ 327–333 (1988)) (the "CWHSSA"), the Department of Labor (the "DOL") conducted an investigation into plaintiff's performance of the contract at issue. By letter dated September 29, 1986, the DOL directed the Corps to withhold payment in the amount of $166,103.05 from the contract funds. In July 1988 the DOL instructed the Corps to withhold an additional $31,140.00 for liquidated damages concerning the CWHSSA violations. Plaintiff and the DOL settled the matter in May 1990, with plaintiff agreeing to pay $48,248.74 as back wages to 83 employees. To effectuate payment, the DOL directed the Corps to transfer the $48,248.74 from the withheld funds to the General Accounting Office. Plaintiff received all funds withheld in excess of the settlement amount. Subsequently, the DOL assessed liquidated damages in the amount of $24,900.00. Plaintiff seeks to recover the $48,248.74.

Plaintiff filed suit in this court on February 2, 1990, seeking an equitable adjustment in the amount of $1,673,821.00 for a quantity underrun and differing site condition. Its claim pertains only to the channel excavation work, not to the infill excavation work.

## DISCUSSION

On summary judgment defendant argues that plaintiff's "total audited actual booked costs" for the period from August 1, 1985, to March 31, 1986, were $3,891,432.00. Def's Br. filed Apr. 8, 1991, at 4. According to defendant, actual channel excavation work, which took place between October 1, 1985, and January 24, 1986, "significantly

underran" the estimated amount of material to be dredged. *Id.* at 4–5.

Defendant contends that plaintiff should be paid only once for its total costs and maintains that plaintiff has been paid or credited $4,149,824.48, as follows: 1) $184,900.00 for mobilization and demobilization; 2) $2,564,224.00 for channel excavation; 3) $152,000.00 for construction of a diversion dike; 4) $1,136,900.00 for infill excavation; and 5) $111,800.00 per P00004 for the unilateral underrun adjustment. All of these monies have been remitted to plaintiff, except for the amount withheld pursuant to the DOL proceeding and $100.00 as a nominal amount to keep the contract open during litigation. Based solely on the total booked costs, defendant asserts that plaintiff realized a profit of $302,216.00 on the channel excavation and a revenue shortfall of $48,824.00 on the infill excavation.

After making certain adjustments to the $4,149,824.48 figure, defendant argues that plaintiff in fact realized a net profit on this contract. Defendant calculates this profit through modifying the $3,891,432.00 figure for total booked costs by subtracting certain legally unallowable amounts and adding back plaintiff's demobilization costs. After performing the pertinent calculations, defendant arrives at a net adjusted cost of $3,684,335.00. Subtracting the net adjusted cost from the total contract earnings of $4,149,824.00, defendant contends that plaintiff realized a net profit of $465,489.00, or 12.63 percent, on the entire contract, including both channel and infill excavation work. Therefore, argues defendant, having earned a profit, plaintiff's claim for an equitable adjustment is moot.

According to defendant, this approach avoids two possible pitfalls. First, paying for total costs solely with regard to the underrun claim sidesteps the differing site condition claim, which defendant otherwise contests. Second, to a large degree, "this approach moots disputes over allegations and amounts of damage for the separate claims. These are disputes whose resolution would be extremely difficult...." Def's Br. filed Apr. 8, 1991, at 7.

Plaintiff rejoins that the $3,891,432.00 in audited costs do not accurately reflect its actual costs incurred in performing the contract. It also challenges various adjustments to costs as proposed by defendant. Additionally, plaintiff disputes defendant's assertion that the audited books reflect that plaintiff made a profit on the channel excavation work, as well as the contention that plaintiff realized a net profit on the contract as a whole. Further, plaintiff argues that, since its claim concerns only the channel excavation work, defendant properly may not use as a base amount the total contract costs and payments, as these costs and payments also include the infill excavation work.

### 1. *Summary judgment standards*

■ Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Defendant, as the moving party, has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553.

To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:

> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In resolving the motion, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson* 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....'" *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoted in *Avia Group Int'l*, 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d,

1560, 1562 (Fed.Cir.1987)). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted).

### 2. *Booked versus actual costs*

■ Defendant argues that since plaintiff's total booked costs under the contract were less than its revenues, plaintiff realized a profit. Plaintiff disputes that $3,891,432.00 represents its total actual costs and submits affidavits of O. Craig Johnson, dated February 28 and May 9, 1991. Mr. Johnson, a certified public accountant, has served as plaintiff's accountant for the past 15 years. He avers that he possess knowledge of applicable regulations and that he works extensively in the construction industry. Specifically, Mr. Johnson states:

> The general ledger books of account show that between August 1, 1985 and March 31, 1986,[3] ... plaintiff recorded in its books costs in the sum of $3,891,-432 which were incurred by the corporation during its fiscal year ending March 31, 1986. Because that period, August, 1985 to March, 1986, included the year end accounting entries for depreciation and Mr. Mourer's annual salary, it is impossible simply to take the total "booked" costs for the months in which they were recorded and compare them to revenues to achieve any meaningful result. The government has done precisely that....

Affidavit of O. Craig Johnson, May 9, 1991, ¶ 4.

3. Contract performance took place from August 1985 to March 1986.

4. In Mr. Mourer's second affidavit, he avers that his company incurred $322,638.00 in repair costs since contract performance ended in March 1986. Affidavit of Charles C. Mourer, May 8, 1991, ¶ 7. Defendant contends that plaintiff first identified these costs in its surreply and that they were neither presented to the contracting officer nor audited. Accordingly, due to plaintiff's inexcusable failure to bring these costs to light earlier, argues defendant, the

Mr. Johnson avers further that the books audited by the Corps to arrive at the $3,891,432.00 cost figure do not include equipment repair costs that plaintiff incurred in performing the contract. According to Mr. Johnson, the books are in this condition due to plaintiff's accounting practice of deferring equipment repairs until contract work is complete and then paying for the repairs out of "previous job 'profits.'" Affidavit of O. Craig Johnson, Feb. 28, 1991, ¶ 17. Mr. Johnson avers that the repair costs claimed are properly allocable to the contract in dispute and that such an accounting practice is often used in the industry.

The court draws all justifiable inferences in favor of plaintiff, the nonmovant. Mr. Johnson's affidavits prevent defendant from establishing on summary judgment that the costs booked by plaintiff under the contract confine its reasonable costs. The dispute over costs is material. Defendant argues that plaintiff has been paid in full, while plaintiff asserts its entitlement to an equitable adjustment of $1,673,821.00, with $1,176,893.00 of this figure deriving solely from non-booked equipment costs.[4] Accordingly, defendant's motion for summary judgment must be denied on this ground.

### 3. *Costs related to DOL proceedings*

Originally, plaintiff claimed costs resulting from the DOL proceeding in the form of back wages, attorney fees, and liquidated damages. Subsequently, plaintiff conceded the unallowability of attorney's fees, pursuant to FAR § 31.205–47(b)(4) (1990), and liquidated damages, pursuant to FAR § 31.205–15(a). Plaintiff still asserts entitlement to recover for back wages paid in the sum of $48,248.74. This amount

court should disallow them as a matter of law. Counsel for plaintiff responded at argument that these costs were in fact presented to the Corps and were audited. Neither party submitted any sworn testimony or other evidence in support of its position. The record is unclear as to whether this item of costs is already included in the $1,176,893.00 figure for equipment costs or is an item as yet to be added. This item of damages is another issue to be resolved at trial.

represents work performed on both the channel and infill excavation work.

Concerning this contested item, defendant initially argues that costs, such as back wages, resulting from a contractor's defense of a claim brought by the United States are legally unallowable pursuant to FAR § 31.205–47(b). The regulation states, in pertinent part:

Costs incurred in connection with any proceeding brought by Federal ... Government for violation of, or a failure to comply with, law or regulation by the contractor ... are unallowable if a result is—

....

(2) In a civil or administrative proceeding, either a finding of contractor liability or imposition of a monetary penalty;

....

(4) Disposition of the matter by consent or compromise if the proceeding could have led to any of the outcomes listed in subparagraphs (b)(1) through (3) of this subsection....

FAR § 31.205–47(a) states that a "penalty," as referenced in FAR § 31.205–47(b)(2), "does not include restitution, reim-. bursement, or compensatory damages."

Plaintiff rejoins that back wages do not fit into any of the regulation's definitions of "costs." Specifically, plaintiff argues that since FAR § 31.205–47(b)(4) refers only to costs incurred in defending debarment proceedings, recovery for additional wages paid to employees for work performed during the contract is allowable.

FAR § 31.205–47(b) is inapplicable to this action. It would appear that FAR § 31.-205–6(h) controls, although neither party brought this regulation to the court's attention. After argument the parties were allowed to submit short briefs on point. The regulation states, in pertinent part:

*Backpay.* (1) *Backpay resulting from violations of Federal labor laws* ... Backpay may result from a negotiated settlement ... that resolves a violation of Federal labor laws.... Such backpay falls into two categories: one requiring the contractor to pay employees addition-

al compensation for work performed for which they were underpaid, and the other resulting from other violations, such as when the employee was improperly discharged ... or other circumstances for which the backpay was not additional compensation for work performed. Backpay resulting from underpaid work is compensation for the work performed and is allowable....

Defendant's position is that this regulation is inapplicable because plaintiff's claim is for neither underpayment of back wages nor penalties; rather, defendant introduces for the first time in the protracted briefing of its motion the factual proposition that recovery would amount to a double recovery since these wages were never paid by plaintiff, but were paid by the Corps instead. In these circumstances defendant's motion must be denied.

4. *Allowability of equipment costs*

Defendant argues that FAR § 31.-105(d)(2) precludes recovery of plaintiff's claim for $1,176,893.00 for increased equipment costs. The regulation states, in pertinent part:

*Construction equipment,* ... means equipment ... in sound workable condition, either owned or controlled by the contractor....

(i) Allowable ownership and operating costs shall be determined as follows:

(A) Actual cost data shall be used when such data can be determined for both ownership and operating costs for each piece of equipment, or groups of similar serial or series equipment, from the contractor's accounting records. When such costs cannot be so determined, the contracting agency may specify the use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment....

According to defendant, the regulation permits a discretionary determination by the contracting officer to limit allowable recovery to actual costs and the predetermined agency schedules. Further, defendant states that, in this case, it is exercis-

ing "its contractual option of allowing equipment costs as actually incurred and audited, within the time frame of the contract." Def's Br. filed Apr. 8, 1991, at 10. Defendant concludes that, since plaintiff's claim does not use the Corps' schedule or formula, the claim is an unallowable estimate pursuant to FAR § 31.105(d)(2).

■ The regulation expresses a preference for determining equipment costs through reliance on actual cost data from the contractor's accounting books, when available. The court rejects defendant's contention that the Corps may limit recovery to actual costs and to the predetermined schedules. If a contractor possesses accounting records sufficient to document its actual costs, such records must form the basis for determining equipment costs. Plaintiff, through the affidavits of Mr. Johnson, represents that it does possess such records. As a legal matter, plaintiff's claim need not conform to the Corps' schedule or formula. Moreover, factually, plaintiff avers that the audits do not accurately reflect the actual costs incurred under the contract. For both these legal and factual reasons, defendant's position is insupportable on summary judgment.

■ A contractor must establish its claimed damages in order to obtain an equitable adjustment. *Neal & Co. v. United States,* 17 Cl.Ct. 511, 513 (1989) (citing *Roberts v. United States,* 174 Ct.Cl. 940, 956, 357 F.2d 938, 949 (1966)); *see Dawco Constr. Inc. v. United States,* 930 F.2d 872, 881 (Fed.Cir.1991). Where liability is evident, a claimant need not prove the amount of damages with exactness or precision; evidence of damages is sufficient when a court or jury is capable of making a fair and reasonable approximation. *S. W. Elec. & Mfg. Corp. v. United States,* 228 Ct.Cl. 333, 351, 655 F.2d 1078, 1088 (1981) (citing *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969)); *see Lindemann*

*Maschinenfabrik v. American Hoist,* 895 F.2d 1403, 1406 (Fed.Cir.1990). Since the measure of recovery for the equitable adjustment in this case likely will be the difference between the contractor's bid price and its actual costs, *see Skip Kirchdorfer, Inc. v. United States,* 14 Cl.Ct. 594, 600–01 (1988), plaintiff must establish the underlying basis for its bid price. On summary judgment, however, the record is barren as to how plaintiff incorporated anticipated equipment costs into its bid structure. Such a showing at trial will be a prerequisite to recover an equitable adjustment.

### 5. *Excess profit*

■ Defendant places great emphasis on its assertion that plaintiff's realization of a 12.63 percent "profit" under the contract is excessive. According to defendant, Engineering Federal Acquisition Regulation ("EFAR") § 15.971(100) (1989), sets a weighted guideline for the highest profit recoverable by a contractor at 7.58 percent. This excessive profit, states defendant, demonstrates that plaintiff has been overcompensated for the work it performed, thereby making its claim for equitable adjustment unallowable. Defendant contends that conformity with these agency guidelines is mandatory when a profit adjustment is sought.

For several reasons the court deems defendant's argument unpersuasive. First, the regulation states that it applies to construction contracts "when price is to be negotiated." Defendant offered no support authorizing the application of this regulation in the context of litigation. Second, plaintiff is not attempting to increase its "profit" by its claim for an equitable adjustment. Rather, plaintiff seeks to recover costs. If awarded, the costs would only serve to lower, not increase, the profit margin realized by plaintiff.[5]

---

5. For example, defendant asserts that plaintiff's contract earnings total $4,149,824.00 and that plaintiff's net adjusted costs total $3,684,335.00. The difference between these two sums yields a profit of $465,489.00, or a 12.63 percent return on the contract. If plaintiff is permitted to recover its claimed $1,176,893.00 for increased equipment costs, the contract earnings figure and the net adjusted costs would each increase by an identical $1,176,893.00, for a "profit" still totalling $465,489.00. In percentage terms,

Next, defendant's "profit" figure combines amounts realized by plaintiff on both the channel and infill excavation work. Plaintiff's claim pertains only to the channel work, and it asserts that its records adequately segregate the two separate portions of the contract. Any intermingling of costs or profit for the channel and infill work would be improper if plaintiff can demonstrate its costs allocable solely to the channel portion of the contract. In such a circumstance, defendant may not credit profits or losses incurred in one area of work to another area of work. Finally, according to Mr. Johnson's affidavits, defendant's "profit" figure derives in part from costs not allocable to this contract. Accordingly, defendant failed to prove that applicable FAR or EFAR regulations bar plaintiff's claim for an equitable adjustment.

### 6. *Capitalization of equipment repair costs*

█ Defendant argues that FAR § 31.-205–24, "Maintenance and repair costs," requires that all repair expenditures be capitalized by the contractor. The regulation states, in pertinent part:

(a) Costs necessary for the upkeep of property ... that neither add to the permanent value of the property nor appreciably prolong its intended life, but keep it in an efficient operating condition, are to be treated as follows ...:

(1) Normal maintenance and repair costs are allowable.

(2) Extraordinary maintenance and repair costs are allowable, provided those costs are allocated to the applicable periods for purposes of determining contract costs....

(b) Expenditures for plant and equipment, including rehabilitation which should be capitalized and subject to depreciation, according to generally accepted accounting principles as applied under the contractor's established policy or, when applicable, according to 30.404, Capitalization of Tangible Assets, are allowable only on a depreciation basis.

Plaintff's position is that section 31.205–34 requires capitalization of equipment costs only if they would be capitalized under a contractor's established policy. Contrary to the court's initial inclination expressed at argument, the court concludes that plaintiff's interpretation of the regulation is strained and that defendant's interpretation is not strained and is reasonable.

FAR § 31.205–24(a) defines what maintenance and repair costs are allowable; FAR § 31.205–24(b), although unartfully worded, also identifies allowable costs, but additionally describes how these allowable costs are to be treated. FAR § 31.205–24(b) identifies certain expenditures "which should be capitalized and subject to depreciation...." The phrase in context is restrictive and signifies that all allowable costs are to be capitalized and depreciated. The contractor's established policy only becomes relevant when determining how the allowable costs are to be capitalized.

Plaintiff's equipment costs are still allowable. However, they must be capitalized and then depreciated. Plaintiff shall be prepared to conform its proofs accordingly.

### 7. *Differing site condition*

In his March 8, 1990 final decision[6] regarding the existence of an impenetrable strata, Lt. Col. Goodell states that the Corps compared results achieved in a "test pit" with results achieved by plaintiff. Based on this comparison, the Corps doubts seriously whether plaintiff actually encountered impenetrable strata. The Corps concluded, rather, that plaintiff's "underrun was primarily the result of difficulties in excavating up to 20 feet deep layers of gravels, cobbles, and boulders." Since plaintiff disputes this contention through

---

however, plaintff's profit margin would decrease to 9.58 percent.

**6.** Plaintiff certified its claim of July 18, 1986, on December 31 of that same year. The contracting officer issued two final decisions, the first of which was withdrawn on April 17, 1989, and the second which issued on March 8, 1990. Since both final decisions issued more than 60 days after submittal of the claim, they are inoperative.

the affidavits of Mr. Mourer, the issue will be addressed at trial. Affidavit of Charles C. Mourer, Feb. 28, 1991, ¶ 12; Affidavit of Charles C. Mourer, May 8, 1991, ¶ 4.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is denied. A scheduling order has been entered separately.

IT IS SO ORDERED.