**SKIP KIRCHDORFER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 690–83C.**

United States Claims Court.

April 6, 1988.

Laurence J. Zielke, Louisville, Ky., for plaintiff.

John S. Groat, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

NETTESHEIM, Judge.

This case was tried following reversal by the Federal Circuit of a decision for defendant on the parties' cross-motions for partial summary judgment and remand for a determination of the amount of damages. *Skip Kirchdorfer, Inc. v. United States,* No. 85–2090 (Fed.Cir. Apr. 4, 1986) (unpubl.) 795 F.2d 1010. After the mandate issued on October 23, 1986, the parties asked that preparation for trial be deferred pending settlement negotiations.

At a status conference held on February 13, 1987, defendant advised that the possibility of settlement would be enhanced by a ruling on the measure of damages. Plaintiff sought damages for compensable excess service calls measured by the standard for breach of contract, including profit. Defendant took the position that damages should be measured by the additional costs sustained by plaintiff due to the breach. A briefing schedule was set, and defendant submitted its motion *in limine* as a motion for partial summary judgment as to damages, asking that plaintiff be awarded no damages since the costs incurred due to the breach did not exceed plaintiff's estimated costs. On May 29, 1987, an order entered

denying defendant's motion, cautioning that the total cost approach to damages is disfavored. Trial was scheduled and dates set for pretrial filings. Ultimately, the trial date was postponed twice to accommodate delays and other difficulties in completing discovery, the latter attributable to plaintiff's slow production of documents. Only one of these postponements deserves mention.

The parties had stipulated to a methodology that plaintiff could use in proving its damages. During discovery plaintiff realized that it had not correctly followed the stipulation. In October 1987 plaintiff obtained the services of Touche Ross & Co. ("Touche Ross") to review its damages analysis in order to verify, *inter alia,* the accuracy of the sample that formed the basis for its price per service call. Although the parties were hopeful that defendant could subscribe to the results of the Touche Ross verification and agree to the total number of compensable excess service calls, this did not occur, and defendant took sharp issue with the Touche Ross report. In connection with plaintiff's expanded effort, the time for additional discovery was enlarged on November 10, 1987, thereby affording defendant the opportunity to retain an additional expert to testify on the recast. However, it was also ordered that this discovery, to which defendant agreed, should not postpone trial beyond the third trial date of January 19, 1988. Over two years had elapsed since this court's liability decision in February 1985, and one year since issuance of the mandate by the appeals court in October 1986. Against this background defendant has no complaint that it was rushed to trial.

At trial plaintiff sought damages for breach of contract in the amount of $656,919.56. Defendant put this claim in stark relief by taking the position that plaintiff should recover nothing.[1]

1. All facts relating to damages have been found *de novo* within the parameters of the Federal Circuit's decision. Pursuant to RUSCC 54(b), any prior findings of this court in the partial summary judgment proceeding that may be viewed as inconsistent with the findings in this opinion have been superseded in accordance with the evidence developed at trial.

## FACTS

Plaintiff Skip Kirchdorfer, Inc. ("plaintiff"), was awarded a fixed-price contract in the amount of $1,088,115.00 by the Department of the Air Force (the "Air Force") to perform maintenance services on family housing units at Patrick Air Force Base, Florida. The major portion of the contract, referred to as CL1N0001 or Line Item No. 1, involved performance of service calls and other types of general maintenance.[2] Line Items Nos. 2 and 3, which are not involved in this case, covered, respectively, a not-to-exceed figure for reimbursable materials and unit price quotations on painting the interior of housing units if the amount of surface to be painted exceeded 200 square feet. Against the Air Force's estimate of $1,435,992 for Line Item No. 1, plaintiff bid $944,915.04, or $78,742.92 per month.

Plaintiff's contract covered a 12–month period beginning on November 1, 1980, and concluding on October 30, 1981, a date subsequently changed to September 30, 1981. Despite the fact that plaintiff had notified the Air Force early on that it was experiencing service calls exceeding the number represented by the historical data, the Air Force, by a modification dated September 29, 1981, exercised its option to renew the contract for an additional one-year term from October 1, 1981, through September 30, 1982. There was no increase in the unit monthly price of $78,742.92 for the services and non-reimbursable materials during the second year.

Prior to bidding, prospective bidders were provided with historical workload data prepared by the Air Force. The Federal Circuit determined that the data represented that the total number of service calls historically required was 18,268 over a 22–month period, yielding a daily average

2. In addition to service calls, the other categories of maintenance work to be performed were maintenance management, change of occupancy maintenance, recurring equipment maintenance, and recurring exterior facilities maintenance.

of 29.68 calls. *Skip Kirchdorfer, Inc.*, No. 85–2090, slip op. at 2. The Federal Circuit also determined that plaintiff made 77.99 calls per day in contrast to the 29.68 represented. *Id.*[3]

Rejecting defendant's contention that the manner in which the data were presented and the contractor's acknowledgment of a discrepancy established a patent ambiguity, thereby obliging the contractor to put the Air Force on notice of the error, the Federal Circuit held that the contractor was entitled to "an accurate presentation of the historical data and to recovery for breach of contract in an amount which will compensate for its reliance on the substantial difference between the reported historical data and the correct figures. *Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793 (1968)." *Skip Kirchdorfer, Inc.*, No. 85–2090, slip op. at 3 (footnote omitted). This ruling is pivotal to the further proceedings before this court, since defendant rejects the notion that plaintiff is entitled to damages for breach. The Federal Circuit explicitly directed otherwise citing *Womack*, a case that characterized large variations between actual and estimated quantities as amounting to a misrepresentation and therefore a breach of contract. *Womack*, 182 Ct.Cl. 399, 412–13, 389 F.2d at 801. Defendant's argument that plaintiff's recovery should be limited to increased costs is buoyed by the last statement in the Federal Circuit's opinion: "The government acknowledges at least $8,000 in increased labor costs...." *Skip Kirchdorfer, Inc.*, No. 85–2090, slip op. at 6. However, at trial before this court the parties took the position that they did not know the source of the reference, and plaintiff has not pursued recovery of this amount denominated as increased labor costs. In

these circumstances the court does not view the quoted language from the appellate court's opinion as detracting from the direction that damages are to be measured by the standard for breach of contract, and the facts have been found accordingly.

Trial focused on two factual inquiries: the number of excess service calls for which plaintiff should be compensated and the price for each compensable excess service call, including labor, material, and travel time. This section of the opinion finds the facts that were not a product of expert analysis or reconstructed data. The following section addresses the law guiding proof of damages by use of experts and damages constructs and finds the facts based on this type of testimony and other evidence.

The factual inquiries in this case were complicated in a variety of ways. First, while the contract did identify maintenance work intended to be performed as a service call, it did not define specifically the term "service call." Second, service calls were logged in plaintiff's Service Call Register, but the time and material expended on each call were recorded on individual service call cards. Third, the Service Call Register provided the gross count of service calls; however, also included in the count were service calls that the parties agree were excludable. *See supra* note 3. Fourth, not all the entries in the Service Call Register represented "service calls," since other work orders under Line Item No. 1 were listed, as well. *See supra* note 2.

### 1. Identification of compensable excess service calls

As noted, the Federal Circuit determined that plaintiff made 77.99 service calls per

---

**3.** The appeals court did not determine that the 77.99 calls per day were compensable excess service calls, *i.e.*, that this number did not include service calls for which plaintiff had received compensation under one of the 38 modifications to the contract or that were cancelled by the occupant or were not compensable for some other reason. Indeed, plaintiff claimed at trial that of the total 43,388 service calls listed on the Service Call Register, 10,060, or 23 percent, were excludable as noncompensable service calls. If the 10,060 noncompensable excess service calls are added to the 19,944 service calls

represented by the historical workload data (per Technical Exhibit 9, the figure represents 9,972 per year x 2), 30,004 service calls could not be classified as extra, since they were required by the contract or compensated for by the modifications. Thus, almost 70 percent of the calls listed on the Service Call Register were excludable. Even if the 7,164 "lawn service maintenance calls" not listed on the Service Call Register were added to the 43,388 total, which would be more consistent with a daily average of 77.99, the exclusions that plaintiff concedes would reduce the 50,552 total by 59 percent.

day. *See supra* note 3. Incident to trial the parties stipulated that the Air Force's Quality Assurance Evaluator, Donald O. Tidwell, reported for the period January 1, 1981, to October 1982 that plaintiff performed 39,795 service calls. This translates to 63.17 service calls per day for a 21-month period. Both these daily figures do not indicate the basis for computing compensable excess service calls; rather, they establish that plaintiff was required to perform more service calls on a daily basis than the 29.68 represented by the Air Force in Technical Exhibit 9.[4] The number of compensable excess service calls itself is derived by making adjustments to the total 43,388 entries that were recorded in the Service Call Register.

Plaintiff has used the Service Call Register to identify all compensable excess service calls. A sample of 7,532 service call cards provides the data for deriving the labor and material costs for each compensable excess service call. What plaintiff refers to as "lawn maintenance service calls," which it regards as service calls, were recorded in the Service Call Register for the first five months of the contract and intermittently for another two months, but they were not recorded on service call cards at any time.

According to Joseph C. Kirchdorfer, plaintiff's president, service calls usually were received by means of telephone requests placed by occupants. Service calls also were generated in limited instances by maintenance personnel or the Air Force's Quality Assurance Evaluator if an obvious maintenance condition existed. As a request or order for a service call was received, the service call clerk would fill out a service call card and log the item in the Service Call Register. Each card carried a designation for quick identification of the type of maintenance task: Exterior inspections and equipment inspections, other types of work required by Line Item No. 1, but not service calls, were denoted by an "E"; a change of occupancy, also required by Line Item No. 1, but not a service call,

was listed as a "T", signifying "turnaround"; and service calls were identified by a number representing the month in which the work was performed. These cards were then placed in a specific tradesman's box, depending on whether he was qualified to perform the requisite task, *i.e.,* plumbing, carpentry, and so forth. For efficiency plaintiff's tradesmen would separate the cards into groups by service area, which was designated as North, Central, or South housing. The employee was to record his arrival and departure time at the residence and all material used, as well as to obtain the occupant's signature to acknowledge the call. The cards were then returned to the clerk, who would record an estimate of time in the register. The register time represented only an estimate because of the contract requirement that all calls should be in one-half hour increments. If the occupant was not home, one-half hour was listed, and the request was cancelled after two response attempts. In a perfect world, merely counting the entries in the Service Call Register would be sufficient to ascertain the number of service calls. Such expectations are illusory.

Mr. Kirchdorfer testified that each register entry may or may not be a service call. In regard to multiple requests at one residence, he testified:

> If we had multiple calls, if someone called in and said, my closet door is off of the track and my front door is broken, that would be one call.

> That wouldn't be a multiple call because it was all within one trade and one item of work.

Consequently, if the request involved two separate trades such as plumbing and carpentry at one residence, there were two service calls. Such calls were not necessarily performed by different individuals if the tradesman was skilled in more than one craft. Thus, an entry in the Service Call Register constituted a possibly compensable service call if it emanated from one

---

4. Plaintiff does not ask that this figure be accorded any significance other than to establish

the fact of loss. *See supra* note 1.

residence and called for one trade skill, even if the tradesman was called upon to perform more than one task within the one trade skill.

### 2. *Unit price for compensable excess service calls*

Plaintiff requests damages on a per-service call price of $31.97, derived through expert analysis. To support the reasonableness of this price, Mr. Kirchdorfer demonstrated that he bid $35.00 per service call, a rate exceeding that which plaintiff asks to be applied in calculating its damages. Plaintiff's evidence that its bid reflected a unit price for each service call was not diminished one whit either on cross-examination of Mr. Kirchdorfer, who prepared the bid, or by any documentary evidence adduced by defendant. Mr. Kirchdorfer, the 60–percent owner of plaintiff and president of plaintiff since 1964, is an experienced government contractor in the provision of painting, roofing, insulation, and construction services. Prior to the award of the instant contract, plaintiff had worked on only one military housing maintenance contract, but held it over a period of seven to eight years. Mr. Kirchdorfer testified convincingly that it has been his practice to use the unit price method in bidding for all government contracts.

The Request for Proposals for plaintiff's contract represented, per Technical Exhibit 9 to the Statement of Work, 18,286 total service calls over a 22–month period. Mr. Kirchdorfer's bid notes reflect that he calculated 9,972 service calls for a 12–month period. The bid notes also show an amount for service calls of $349,020.00. The notes demonstrate how, initially, Mr. Kirchdorfer assigned to the 9,972 annual number of service calls the labor cost of $25.00 per call, reflecting a one-hour rate for maintenance employees, for a total of $249,300.00. To this he added $10.00 per service call for the average nonreimbursable materials, yielding a total of $349,020.00. Based on the 9,972 annual service calls, this total translates to $35.00 per service call. The bid notes carry this figure through to Mr. Kirchdorfer's final bid amount for Line Item No. 1.

The analysis, however, is not as straightforward as it appears. Line Item No. 1 includes five types of maintenance services, one of which is service calls, and Mr. Kirchdorfer planned to use the service call maintenance employees to perform other services required by Line Item No. 1 during slack times. In addition to service calls, Line Item No. 1 also called for: maintenance management, change of occupancy maintenance, recurring equipment maintenance, and recurring exterior facilities maintenance. Mr. Kirchdorfer took pains to ascribe the different elements of his bid to the different tasks within the contract's scope of work. Thus, in listing plaintiff's total manpower requirements, Mr. Kirchdorfer had to account not only for service calls, but also for the manpower to perform change of occupancy maintenance for 850 units estimated per year, per Technical Exhibit 9; annual inspection and maintenance of appliances that he estimated at 840 units annually consistent with Technical Exhibit 10; and 840 exterior inspections. He also initially estimated a five-man office considered sufficient to run plaintiff's operations, including a supply clerk, an inspector, a service call clerk, and two other office personnel. Mr. Kirchdorfer's final figures drop manpower for the supply clerk, reflecting not the absence of the function, but Mr. Kirchdorfer's assessment that he could perform the contract with fewer personnel.

Mr. Kirchdorfer envisaged utilizing 5 men for service calls—1 electrician, 2 plumber/air conditioner men and 2 general maintenance men. Plaintiff's litigation position is that he estimated 5.5 employees for service calls. *See, e.g.,* Affidavit of R. Wayne Stratton, (undated), at 3. ("Stratton I"); Plf's Br. filed May 21, 1987, at 10. This difference is pertinent to the number of additional maintenance employees plaintiff utilized to perform the excess service calls, but does not detract from the unit price per call. The latter reflects the number of calls, not employees.

Mr. Kirchdorfer's bid notes further reveal that his bid was the product of calculating labor and material for the five ser-

vice categories (and tasks within categories for all items other than service calls) of Line Item No. 1. The notes depict that Mr. Kirchdorfer made consistent reductions among various items, ultimately reducing projected costs of $1,023,945.00 to $823,-945.00. According to Mr. Kirchdorfer's calculations, this latter figure translated into $68,000 and some $700.00 per month, which the contractor read as $742.92, since he "never bid a contract in the exact amount if the bid comes out." To $68,-000.00 Mr. Kirchdorfer added $10,000 per month for profit and travel associated with administering the contract, approximating $78,000. Thus, Mr. Kirchdorfer bid $78,-742.92 per month, and the Air Force accepted this amount as the monthly price for Line Item No. 1.

### 3. *Increased labor costs*

██ Although his recollection was selective on other points, Mr. Kirchdorfer's extensive testimony afforded the court full assurance that not only was his bid calculated on a unit price basis, but that he bid the contract on the assumption that 5.5 men would be required to perform the service call component of the contract. Moreover, Mr. Kirchdorfer's testimony, coupled with the Service Call Registers for July and August 1981 and one week in January 1982, fully support plaintiff's contention that it incurred increased labor costs in terms of the number of maintenance workers required to perform service calls.

Even excluding a major backlog caused by the apathy of the incumbent contractor, which stopped work one month before its contract terminated, plaintiff soon was experiencing 64 service calls a day, according to Mr. Kirchdorfer. It also soon became apparent that labor was costing twice what he anticipated. Excerpts from the Service Call Register for July and August 1981 and the week of January 25–30, 1982, show as many as 12 employees were required to work on service calls, which is the number to which Mr. Kirchdorfer testified.

Defendant makes much of the fact that on September 22, 1980, plaintiff submitted a Proposed Manning or Personnel Chart

reflecting the contractor's intention to man the contract with 5.5 maintenance employees to perform service calls (furnace and air conditioning, appliance, plumbing, and electrical repair (3.5) and other maintenance, such as glass, roof leaks, and carpentry (2)). In addition, plaintiff listed at least 6.5 maintenance employees for change of occupancy, or turn-around maintenance: pre-work inspection (1), furnace and air conditioning (1), appliances (1), plumbing (1), electrical (.5), carpentry (1), and grass mowing and hedge trimming (1). Two maintenance employees were listed for annual equipment maintenance, 1 for well pumps, and 1 for exterior repair. Part-time, or variable, manpower was listed for painting. Plaintiff also listed 1 chief clerk, 1 supply clerk, and 2 service call and work authorization clerks.

From this manpower proposal, defendant argues that plaintiff was not required to hire additional maintenance employees to perform the service calls, since plaintiff had intended to provide at least 16 qualified personnel, in addition to 4 clerks. Indeed, Mr. Kirchdorfer launched defense counsel into a peripheral interrogation by testifying that it was his practice not to go in short with a proposed manning chart: "It's ballooned in manpower and everything;" "It's ballooned because I want to make myself look good;" "This is an effort to effect award of a contract to me. I'm not going to put half manpower on here. I'm going to put double. I'm going to make them think I'm giving them the moon." It was Mr. Kirchdorfer's view that the chart was not his proposed manning chart when he figured the job, but "a report that I sent into the government as an aid to them to award me a contract." He believed that he could use the chart to convince the Air Force that he had sufficient manpower to perform the contract, even though he may have been able to do the work with fewer employees.

Defendant's insistence that plaintiff should be held to provide the manpower for service calls that it proposed for performing the entire contract ignores the Federal Circuit's determination that the Air Force breached the contract by misrepresenting

the historical data on the number of service calls that the contractor should expect to perform. Moreover, this position ignores the fact that plaintiff was not required to make projected manpower for other categories of work called for by the contract available to perform service calls in excess of the number represented by the historical data. If the number of service calls had been consistent with the Air Force's representation, or a number not significantly in excess thereof, plaintiff could not have complained that it was required to provide additional personnel not listed on its proposed manning chart or to draw from personnel identified to other categories of work. However, the consequences of breaching a part of a contract (that the Federal Circuit determined was nonfungible by ruling that plaintiff could rely on the historical data) cannot be excused because the contractor is required to provide personnel that in bidding on the contract it did not anticipate would be required for that portion. In other words, the contractor must furnish sufficient personnel indicated in a manning chart to discharge its contractual responsibilities under each category of work required by the contract, and in this case plaintiff could not have complained if all the manpower proposed for the entire contract was required to perform a number of service calls consistent with the number represented.

Defendant's position would be well taken if the contract had not broken out categories of work and represented the number of service calls that plaintiff would be required to perform as one category of work. The record does not establish that overall plaintiff hired more employees for longer periods of time to discharge all of its contractual responsibilities, but that is not a prerequisite to showing the fact of damage. Rather, plaintiff was required to, and did, show that more employees were required to perform service calls than plaintiff either bid or proposed on its manning chart for this work. Although Mr. Kirchdorfer's attitude concerning the proposed manning chart is perhaps cavalier, it would be unfair to use his proposed manning chart to mitigate the damages sustained due to defendant's breach.

### 4. *Lawn mowing*

■ Plaintiff asks that 7,164 "lawn service maintenance calls" performed for base housing units between April 1981 and October 1982 be added to the 43,388 service calls listed in the Service Call Register, for a total count of 50,522 service calls. Plaintiff had listed lawn mowing work orders in the Service Call Register from November 1980 through March 1981. At the Air Force's direction, this work was not recorded in the Service Call Register after March 1981, although Touche Ross found some orders for lawn mowing during April and May 1981 in the Service Call Register. Per Technical Exhibit 7 to the statement of work, the Air Force recorded lawn mowing orders on a weekly work list given to the contractor to be completed during the following week. As discussed more fully in the next section of this opinion, the 7,164 total comes from these lists. The parties agree that Line Item No. 1 required plaintiff to cut lawns of vacant units only, since the lawns of occupied units were to be maintained by their residents. The issue becomes whether this lawn work constitutes a service call.

Mr. Tidwell, the Air Force's Quality Assurance Evaluator, who testified by deposition, considered cutting lawns as service calls, as did Mr. Kirchdorfer. Mr. Tidwell's deposition testimony, albeit an admission, is not persuasive, nor is Mr. Kirchdorfer's, given 1) the explicit definition of service calls in the contract of plaintiff's predecessor that plaintiff regarded as defining the term under its own contract, 2) the distinction between service calls and lawn maintenance that was made in plaintiff's contract, and 3) plaintiff's proposed manning chart which is inconsistent with Mr. Kirchdorfer's testimony.

First, the incumbent contractor, Glenn N. Allen, Maintenance ("Glenn Allen"), had performed the same work denominated as service calls under plaintiff's contract. Mr. Kirchdorfer testified that he read the definition of service calls in Glenn Allen's con-

tract as including lawn mowing. The Glenn Allen contract defined service calls, as follows: "those verbal and/or written requests for correction of deficiencies occurring in the facilities covered by this contract." Although the Glenn Allen contract does provide that "[g]rounds maintenance [cutting grass, trimming shrubs, etc.] will be performed by the Contractor upon receipt of work order....", grounds maintenance is not included under the heading of service calls, but is categorized as one of the seven separate categories of services to be performed under the Glenn Allen contract, including preventive maintenance, service calls, appliance repairs, interior painting of quarters, grounds maintenance, emergency purchase of supplies, and vitex and hedge trimming.[5]

Second, Mr. Kirchdorfer's bid notes reveal that at least initially he broke the task out separate from service calls and viewed lawn calls as related to change of occupancy maintenance. On pages 1 and 3 of Mr. Kirchdorfer's bid notes, he took the Air Force's estimate for 850 change of occupancy maintenance calls and assumed that he would have to cut the lawn only once per change of occupancy because the vacancy should not be of continuing duration. Yet Mr. Kirchdorfer also testified that he later decided that lawn calls really were service calls. As evidence of this change of view, Mr. Kirchdorfer pointed to the fourth page of bid notes indicating that he reduced a figure of $90,000, which he had assigned to cover both lawn maintenance and hedge trimming, by $50,000 for a reduced estimate of $40,000. The reason for this deduction is not evident on the face of the bid notes; page 4 of the bid notes contains a number of deductions from all aspects of the contract, including the undisputed service call category. Mr. Kirchdorfer explained that although he first treated residential lawn maintenance as related to change of occupancy maintenance calls, he

interpreted the contract as not requiring him to mow lawns in connection with changes of occupancy; that lawn mowing was a service call; and that he had estimated one person too many for service calls and so did not change his bid for service calls to allow for lawn mowing.

Technical Exhibit 1 to the contract's Statement of Work sets out performance standards for different items found in the contract. Six general categories of work are identified, and each is presented in a chart format. These charts set out, *inter alia*, the required services under each category, the standard of performance, method of surveillance, and so on. These six headings are

    Maintenance Management
    Change of Occupancy Maintenance
    Service Call
    Recurring Equipment Maintenance
    Recurring Exterior Facility Maintenance
    Additional Line Items

Although the service call chart does not describe the types of calls to be performed, grounds maintenance services are listed under the chart for Additional Line Items. Thus, the Statement of Work for this contract does not support plaintiff's position that lawn maintenance was a service call.

Third, plaintiff's own proposed manning chart of September 22, 1980, included lawn maintenance and hedge trimming as an activity under change of occupancy, which the contract treats as a category of work separate from service calls. Even though it is not clear how long after the preparation of Mr. Kirchdorfer's bid notes this manning chart was developed, it is clear that it does not support Mr. Kirchdorfer's testimony that he considered lawn maintenance as a service call.

■ Plaintiff finally argues that if lawn mowing is related to changes of occupancy,

---

5. In performing his damages analysis, Mr. Stratton, plaintiff's expert, adopted the definition of a service call in the Glenn Allen contract. Mr. Stratton before trial submitted an affidavit averring, in part: "The definition of service calls as applied to the Kirchdorfer contract, did not differ from that employed in the predecessor's

contract." Stratton I at 3. Mr. Stratton's later affidavit, supplementing his expert damages analysis, does not modify this statement. Affidavit of R. Wayne Stratton, Nov. 23, 1987. Therefore, as a matter of expert opinion, as well, lawn mowing was not a service call.

the number of work orders vastly exceeded Technical Exhibit 9's annual estimate of 850 units for change of occupancy and that plaintiff is due an additional recovery for this misrepresentation. Although the tasks for change of occupancy were included within Line Item No. 1, the only pre-bid information that the Federal Circuit determined to be misleading was that pertaining to service calls, not changes of occupancy. Mr. Kirchdorfer testified that he assumed that the number of lawn calls would be the same as the number of change of occupancy maintenance calls represented in the Air Force's historical data. The number of work orders for lawn mowing was increased, according to Mr. Kirchdorfer, due to renovation undertaken in various sectors of the housing units at Patrick Air Force Base. He claims that this renovation caused housing units to remain vacant for longer periods than had been anticipated. Thus, plaintiff urges another misrepresentation of the historical data.

This attempt to revisit the issue of liability must be rejected. Plaintiff has had ample opportunity to make out its misrepresentation case both on cross-motions for partial summary judgment in this court and before the Federal Circuit on appeal. Plaintiff came to trial prepared to justify lawn mowing for base housing as service calls, not as change of occupancy maintenance calls that had been underestimated. Moreover, as recounted above, Mr. Kirchdorfer's explanation of how he estimated his bid shows that he bid the contract on the basis that lawn mowing was not a task under change of occupancy maintenance. Plaintiff's pretrial filings did not put defendant on notice of any alternate theory to support inclusion of this type of work as excess work that should be compensated. *See John D. Hensler, Inc. v. United States*, 5 Cl.Ct. 92 (1984), *aff'd mem.*, 765 F.2d 158 (Fed.Cir.1985) (rejecting attempt to add issue in post-trial briefing that had not been identified for trial). Even if plaintiff's argument were considered, Mr. Kirchdorfer admitted that he did not rely on the estimate for change of occupancy maintenance calls in preparing his bid, since he lumped lawn maintenance in with service calls.

Ultimately fatal to plaintiff's claim is that no proof with respect to damages sustained in performing the alleged extra lawn work was provided to form the basis for an award. As will be discussed in the next section of this opinion dealing with expert testimony, Mr. Stratton's analysis of labor rates, cost of materials, and allowance for travel failed to take any account whatsoever of labor rates and/or materials for lawn maintenance.

### 5. Travel time

Mr. Kirchdorfer also supplied the basis for calculating travel time for each service call at 15 minutes. The figure was a reasoned estimate. Since service calls were performed by sector within Patrick Air Force Base, it is unlikely that maintenance employee spent more than 15 minutes in leaving the previous address, driving to the next assignment, and mobilizing for the service call. The diagrams of housing units in evidence show that Patrick Air Force Base is a large complex divided into the North, Central, and South housing. One of the problems with this estimate is plaintiff's failure to account for performing multiple service calls within the same trade at the same residence by one tradesman or any efficiencies achieved because of proximate residences. Another is that some service calls required no travel time. An adjustment has been made in connection with calculating the price per service call for these problems. On the whole, however, the 15-minute allowance is reasonable.

### 6. Materials retrieved from dumpster

Mr. Kirchdorfer arrived before the date on which the contract commenced to set up plaintiff's inventory and office operations. He testified that the incumbent contractor, Glenn Allen, had fallen into disarray at the end of its contract performance, such that plaintiff was asked to undertake a substantial backlog of service calls for which plaintiff has been compensated through a contract modification. As part of their stellar performance, Glenn Allen personnel consigned to a dumpster unused materials,

which Mr. Kirchdorfer retrieved and used in "my work on the contract". Mr. Kirchdorfer described the amount of materials as filling seven or eight vans and guessed its value at "over $100."

It should be noted that Mr. Kirchdorfer's testimony on this subject, as well as some others, was wrested with difficulty and, even then, was vague. His testimony on the points that have been discussed was deemed credible precisely because of his sharp recollection. An experienced contractor seeking recovery for all of his material costs used in connection with excess compensable service calls can be expected to have a better notion of the value of seven or eight van loads of materials that he himself retrieved than being pressed into guessing a value at "over $100." Although Mr. Kirchdorfer's selective memory does not warrant a finding that his testimony should be discounted, the reductions in the amount of plaintiff's claim take account of this fact of the trial.

## DISCUSSION

█ Defendant argues that in order to recover damages for the Air Force's breach of contract, the burden is on plaintiff to demonstrate its "actual costs" in completing the contract as a starting point for measuring plaintiff's damages. Defendant takes the position that plaintiff is limited in its damage recovery only to the excess out-of-pocket cost to plaintiff above its bid price and urges this court to adopt the total cost method in arriving at the measure of damages.

Defendant is correct that the burden of proof rests with plaintiff to prove its damages claim in a breach of contract action. As the Court of Claims stated in *Boyajian v. United States,* 191 Ct.Cl. 233, 239, 423 F.2d 1231, 1235 (1970), "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach...." Plaintiff has the further obligation of demonstrating "that the excess costs claimed must be tied in to defendant's breaches."

*J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 108, 347 F.2d 235, 259 (1965).

In *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759 (Fed.Cir.1987), a case involving an improper default determination made by the contracting officer against a construction contractor, the Federal Circuit concluded that the burden of proof was upon defendant to show that the default termination was proper. 828 F.2d at 763. However, once liability is established, the burden of proof lies with plaintiff to demonstrate its damages: " '[T]he claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation....' " *Id.* at 767 (quoting *Willems Indus., Inc. v. United States,* 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied,* 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962)). The question remains what the measure of damages should be.

Defendant advocates the total cost method as the measure of plaintiff's damages. According to defendant, plaintiff's actual cost of performing the contract did not exceed its estimated cost of performance, discounting the revenues received through modifications to the contract. However, in *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662 (1984), the Claims Court reiterated the Court of Claims' disapproval of the total cost approach. The court stated: "The total cost theory of recovery was not favored by the United States Court of Claims and was tolerated only when no other mode of recovery was available, and when the reliability of the supporting evidence was fully substantiated...." 5 Cl.Ct. at 676 (citation omitted). In *Boyajian* the court noted the unacceptability of the total cost approach, stating that it was only a starting point in determining damages. The Court of Claims, in referring to four cases which used a modified total cost approach, stated:

[T]he total cost computation was used as "only a starting point," with such adjustments thereafter made in such computation as allowances for various factors as to convince the court that the ultimate,

reduced, figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint....

191 Ct.Cl. at 247, 423 F.2d at 1240 (citation omitted). The court went on to discuss the four cases, pointing out that each recognized the problem with adopting the total cost approach, concluding that it was only to be used when there is no other method for assessing damages. *Id.* at 251, 423 F.2d at 1242.

This court is presented with the unusual circumstance of defendant's asking for the adoption of the total cost approach. In *J.D. Hedin,* the Court of Claims concluded that the total cost method should be used only when "there is no other alternative, since ... the lack of certainty as to the amount of damages should not preclude recovery." 171 Ct.Cl. at 86, 347 F.2d at 247 (citations omitted). The court rejected use of the total cost theory even though it would be advantageous to the Government, stating: "[W]e do not think it proper to use the 'total cost' method here, since the exact amount of excess costs which plaintiff incurred as a result of defendant's breach can be precisely computed...." *Id.* at 105, 347 F.2d at 257.

In *S.W. Electronics & Manufacturing Corp. v. United States,* 228 Ct.Cl. 333, 655 F.2d 1078 (1981), the Court of Claims listed four criteria, "all of which must be demonstrated before a total cost recovery will be permitted." These criteria are " '(1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.' " 228 Ct.Cl. at 347, 655 F.2d at 1086 (quoting *WRB Corp. v. United States,* 183 Ct.Cl. 409, 426 (1968)). Translating these criteria to the Government, defendant has not shown that the criteria have been met in order to justify total cost as the applicable methodology.

Plaintiff argues that the court should apply the standard adopted in *Eastern Ser-*

*vice Management v. United States,* 363 F.2d 729 (4th Cir.1966), a case involving a federal office building cleaning contract. The bid invitation in *Eastern Service Management* included a description of the type of spaces required to be cleaned, as well as the total area to be cleaned. The actual space to be cleaned was 8,700 square feet larger. The Government had erred by failing to include in its specifications the space in the lobby, corridors, and rest rooms. The contractor sought to recover the actual cost of cleaning these specific areas. The Fourth Circuit concluded that the error was not directed at the type of space to be cleaned, but, rather, the total space within the contractor's bid, including the cleaning of different types of areas. Therefore, the court concluded:

> The proper test would be the lesser of the reasonable cost of cleaning the additional area of average office space or the amount additional that the contractor would have bid according to the formula used by the contractor in bidding this job had he known the true size of the building....

363 F.2d at 732–33.

Defendant attempts to distinguish *Eastern Service Management* by arguing that the Air Force did not agree to compensate plaintiff based upon the number of service calls it performed, but for performing comprehensive maintenance services. Therefore, according to defendant, the measure of damages should be the difference between plaintiff's actual costs compared with its estimated costs. In *Eastern Service Management,* defendant claims that there was a direct correlation between the misstatement in the specifications and area to be cleaned as they affected both the bid price and the actual cost incurred by the contractor. Defendant contends that in this case there is no direct correlation between the number of service calls and plaintiff's bid price. This assertion is contrary to fact, since it was an error in the historical data upon which plaintiff relied in making its bid estimate that caused the breach. The error in *Eastern Service Management* in underestimating the area

to be cleaned is akin to misstating the historical data in the case at bar.

Finally, defendant argues that in a breach of contract action plaintiff is not entitled to its profit, but "may only recover its actual increased costs." Def's Br. filed May 7, 1987, at 3 (citing *William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 477 F.2d 930 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974)). However, defendant places improper reliance on this case, as the court stated: " 'The only substantial difference between the sum calculated under equitable adjustment or convenience termination standards and the amount recoverable in a common law action for contract breach is the non-inclusion in the former of anticipated but unearned profits.' " 201 Ct.Cl. at 626, 477 F.2d at 936 (quoting *Nolan Bros. Inc. v. United States*, 186 Ct.Cl. 602, 607, 405 F.2d 1250, 1253 (1969)). The intent would not be to exclude payment of profits already earned by plaintiff through performing additional service calls after defendant's breach. This is not an instance where plaintiff is seeking what it could have earned had it completed the contract, but merely what it is entitled to for its additional performance.

The Court of Claims in *Boyajian v. United States* instructed that the failure of a contractor to show the amounts of increased costs attributable to breach does not prevent the submission of reasonably satisfactory proof of increased costs that are based, for example, on acceptable cost allowance principles or on expert testimony. 191 Ct.Cl. at 252, 423 F.2d at 1242. Thus, a contractor is not required to show the amounts of increased costs attributable to breach by segregating those costs attributable to the breaches. "Contractors rarely keep books in such fashion...." *Id.*[6]

■ Plaintiff has sought to prove its damages by deriving the number of compensable excess service calls from the 43,388 entries in the Service Call Register. Plaintiff then multiplies this total by a price per service call from the data recorded on a sample of 7,532 service call cards. Thus, although the product of expert analysis, plaintiff's damages claim is based on records of its actual contract performance: the Service Call Register contains entries of service calls; the service call cards contain the tradesman's identity, time entailed, and materials used; plaintiff's invoices record the cost of material; and Mr. Kirchdorfer's bid notes set forth the contractor's expectation of the unit cost per service call, which serves as a baseline figure.

In 1984 the court, having been advised that over 40,000 service call cards were involved, directed that proof of damages be presented in summary form in accordance with Fed.R.Evid. 1006. On August 7, 1984, counsel entered into a "Stipulation for Method of Random Sample of Service Calls" for "the method of making a random sample of service calls in order to avoid any burden that plaintiff may incur in the examination and copying of all 43,162 service call cards...." Stipulation at 1. The stipulation further provided: "The parties agree that the results of the sample may be used for any purpose, including plaintiff's attempt to show damages." *Id.* It was further stipulated: "Plaintiff may ... use this sample in order to show by extrapolation contract performance during the full term of its contract." *Id.* ¶ 6. The stipulation provided for a random sample selected from each of the 24 months of contract performance. The sample was to represent two days of each week, or a total of eight days of service calls for each month, including different weeks and days within weeks. Pursuant to the stipulation, the cards for the specific days were then provided to plaintiff, which was to exclude from the sample cards all previously compensated claims, such as backlogged work from the previous contract, occupant neglect, or low water flow claims resulting in heat or air conditioning service. In addition, plaintiff was to exclude calls cancelled by the occupant or through the occupant's

---

**6.** This court's order of July 31, 1987, erroneously called upon plaintiff to produce records of segregated expenses since plaintiff viewed itself as in a claim situation from the inception of the contract.

failure to be home for the service call and all entries proporting to be pump maintenance, preventive equipment maintenance, exterior inspections, work outside of scope of contract, change of occupancy maintenance, duplicate work orders, incomplete requests, or interior painting that exceeded 200 square feet—items which were compensable under another part of the contract.

Plaintiff retained the services of Mr. Stratton, a certified public accountant with Jones, Nale & Mattingly, to design and implement a statistically reliable method of analyzing the service call cards. A total of 7,532 cards was provided to Mr. Stratton for analysis. Each card revealed the starting and ending time of the work, the nature of the work, the employee's identity, the total man-hours to complete the work, and a description of the parts and materials used in performing the work. The cost of all parts and materials listed on each of the sample cards was taken from invoices retained by plaintiff. After this amount was totalled, the total amount of all parts and materials costing over $50.00 per call was deducted, since this amount had been reimbursed to the contractor. The unreimbursed materials cost was $62,066.32. Mr. Stratton added a 30–percent mark-up, which in his view was reasonable, to compensate for handling of the materials. The Air Force's estimate for the contract had utilized a 30–percent mark-up for material. The total of $80,686.22 was divided by the 7,532 service call cards to yield an average cost of $10.71 per service call.

To establish the labor costs for the sample, Mr. Stratton took the labor rates from the "Audit Report on Labor and Burden Rates" for the period October 1–27, 1980, by the Defense Contract Audit Agency (the "DCAA"). The DCAA audited hourly wage rates for three categories of employee labor classifications based on the classifications in Mr. Kirchdorfer's payroll records: maintenance, maintenance specialist, and laborer. The hourly wage rate approved by the DCAA audit effective October 1, 1981, recognized the following mark-ups representing indirect expense rates (labor burden) that were utilized by Mr. Stratton:

| | |
|---|---|
| On-site Overhead | 50% |
| Taxes and Insurance | 15.409 |
| Vacation and Holiday | 9.2 |
| Home Office Overhead | 21. |
| | 95.609% |

In addition, Mr. Stratton included a 10–percent profit, which was in accordance with the allowance Mr. Kirchdorfer had provided for in his original contract bid. The DCAA also had audited plaintiff's proposed profit of 10 percent.

Next Mr. Stratton calculated the number of minutes required to perform service calls as recorded on the cards. He divided the hourly wage rate for the appropriate employee by 60 to yield a per-minute wage cost and multiplied that figure by the number of minutes required by the employee to perform the service work. This figure, in turn was multiplied by the 7,532 sample cards. The total labor cost calculated on this basis was $129,020.58, excluding travel time to and from the site where the work was performed. The average labor cost was calculated by dividing the total figure by the 7,532 sample cards to yield $17.13.

Mr. Stratton calculated travel time on the basis of 15 minutes, the figure supplied by Mr. Kirchdorfer. Rather than identify the particular employees by labor category, Mr. Stratton used the wage rate for the lowest paid category of maintenance service worker from the DCAA audit, which calculated to $.275167 per minute. This figure was multiplied by 15 minutes, which was further multiplied by 7,532 sample cards to yield $87,556.76. Mr. Stratton's analysis thus developed the average price per service call, as follows: material, $10.71 (including a 30–percent mark-up); labor and burden, $17.13; travel time, $4.1275 = $31.97. He calculated plaintiff's claim by multiplying this price times the total number of excess compensable service calls.

Identifying the number of compensable excess service calls began by counting the number of entries recorded in the Service Call Register, 43,388, and adding 7,164 lawn maintenance service calls from April

1981 to October 1982, for a total gross count of 50,552. A subtraction of 9,395 calls was then performed, based upon Mr. Kirchdorfer's representation that these entries were not includable pursuant to the parties' stipulation, to yield 41,157 calls as called for by the contract. Mr. Stratton took the Air Force's historical data of 9,972 calls per year, multiplied it by 2 (19,944), and subtracted that figure to reach a net excess service call total of 21,213. By letter of December 13, 1987, plaintiff withdrew 665 additional calls, which were excluded to yield 20,548 as the total number of excess compensable service calls. Multiplying this figure by the average cost per service call of $31.97, plaintiff totals its damages at $656,919.56.

Defendant faulted plaintiff's methodology on two grounds. First, defendant presented an analysis reflecting indicated total costs, or a modified total cost approach, by which it proffered that plaintiff's costs attributable to the service call portion of Line Item No. 1 were significantly less than its gross receipts therefor. Second, defendant challenged plaintiff's methodology particularly with respect to the exclusions for work already compensated for; inclusion of "lawn service maintenance calls"; and double-counting the mark-up for materials, labor overhead rates, and labor costs.

Plaintiff's damages analysis does not suffer from any conceptual deficiencies, and the testimony of defendant's expert, Edmond A. Zaremsky, Jr., is decisive on point. Mr. Zaremsky, a certified public accountant, who commenced employment with DCAA in 1973, is familiar with DCAA's policy for reviewing contract claims and has had experience with writing and supervising audit reports on contract claims. Since 1986 he has been the Program Manager, Accounting, Policy Division, DCAA Headquarters. Although Mr. Zaremsky approved defendant's indicated total cost approach, he offered the opinion during his direct examination that the respective merits of defendant's approach, put forward through its expert, Charlie O. Cochran, and Mr. Stratton's analysis came in at a tie:

Q. Now, in your opinion, what better approximates the actual costs incurred by SKI as the result of performing excess service calls?

A. That's difficult. I would call it a tie really, because you have unknowns on a total cost method of profit and working with Mr. Stratton's analysis, you have that other unknown how much variation is there in a unit price of a widget, when I priced that widget did I use the right quantity, did I actually use—when I used that screw, did I use that screw on the one with the high unit cost or the one with the low unit cost, and that will give you a different answer. So it [is] sort of a toss up. And that's the best I can say because of the unknowns in both methods.

Having had the opportunity to observe and assess Mr. Zaremsky as he testified, including his articulation of the DCAA's policy on various aspects of cost accounting, the court accords great weight to this witness' testimony. It must be emphasized that the total cost approach to damages is only used when it is the only possible method by which damages can be computed, *J.D. Hedin Construction Co.*, 171 Ct.Cl. at 86, 347 F.2d at 247, and Mr. Zaremsky's testimony does not establish that Mr. Stratton's analysis is so faulty as to render it invalid. Indeed, defendant's own expert, Mr. Zaremsky, did not even support defendant's indicated total cost approach, presented by Mr. Cochran, as more reliable than the Stratton analysis. Mr. Zaremsky explained that the indicated total cost approach isolated those Line Item No. 1 costs and revenues attributable to service calls, but it does not avoid the vice of depriving the contractor of both the economies and efficiencies with which it could have performed and the profit it could have accrued had the contract not been breached. Nothing in defendant's indicated total cost approach, including the testimony of Messrs. Zaremsky and Cochran, presumed to correct this deficiency.

Because it is found, principally based on Mr. Zaremsky's testimony, that the indicated total cost analysis put forth by de-

fendant does not counter the Stratton analysis, but seeks to substitute for it, no useful purpose would be served by discussing Mr. Cochran's testimony in detail. The testimony of defendant's witness was based upon documented costs for labor and material drawn from modifications issued under this contract. These amounts are not reliable, since the modifications were the result of the contractor's negotiating with the Air Force based upon prework estimates. It further should be noted that under plaintiff's adroit cross-examination, the figures Mr. Cochran relied upon to substantiate defendant's claim that plaintiff's revenues outstripped labor costs and material invoices were shown to be suspect. By this examination plaintiff demonstrated that the total cost approach can be manipulated to divert profit away from the contractor by focusing on the less profitable aspects of the contract.

Based on the testimony adduced at trial and analysis of the documentary evidence, it is found that plaintiff has offered reasonably satisfactory evidence of its damages computed on an acceptable basis, *Boyajian*, 191 Ct.Cl. at 254, 423 F.2d at 1244, in that plaintiff has provided a methodology for proving the amount of its loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation. *Lisbon Contractors*, 828 F.2d at 767. However, the court's confidence in this finding is the product of adjustments to the claim, taking into account defendant's meritorious objections to plaintiff's damages analysis. Although these adjustments do not signify a "jury verdict" recovery, the following discussion demonstrates that plaintiff's damages analysis, as adjusted, certainly satisfies that standard. When damages are definitely attributable to a breach but only uncertain in respect to their amount, a jury verdict can establish fair and reasonable approximation of the damages incurred. *Assurance Co. v. United States*, 813 F.2d 1202, 1205 (Fed.Cir.1987) (citing cases); *see also Branning v. United States*, 784 F.2d 361, 364 (Fed.Cir.1986) (approved jury verdict to set value of property in condemnation case).

The Stratton analysis withstands substitution by the indicated total cost approach, but plaintiff's direct testimony, what was developed on cross-examination of plaintiff's witnesses, and defense testimony revealed shortcomings in the Stratton analysis. In order to justify an award, downward adjustments must be made.

### 1. *Inclusion of lawn service maintenance calls*

■ Plaintiff seeks compensation for 7,164 work orders for mowing lawns of vacant housing units as excess compensable service calls. This figure was developed by Darrell J. Oyer of Touche Ross. Lawn maintenance orders were recorded in the Service Call Register from November 1980 through March 1981, and some calls (122) were recorded in the register in April and May 1981. Mr. Oyer began his count for the period April 1981 to October 1982, during which the calls were recorded on weekly work orders prepared by the Air Force. In addition to the 122 calls, Mr. Oyer excluded a total of 16 weeks during this period for which the work lists were missing. The resulting number was 7,164.

The court has found and concluded, based principally on lay testimony, *see also supra* note 5, that residential lawn mowing did not constitute a service call under the contract. However, if this work could be classified as a service call, plaintiff would annihilate Mr. Stratton's damages analysis. Mr. Stratton did not take any account of work orders for lawn maintenance in his service call pricing analysis—by way of pricing the labor or cost of materials expended or factoring in the time for this work. The contractor did not maintain service call cards for lawn mowing, and service call cards were Mr. Stratton's source material. No testimony was elicited at trial as to the type of laborer used—in terms of hourly wage rate—to perform these work orders, the length of time involved, or what few materials or supplies, *e.g.*, oil and gas for mowers, were involved, as compared to the material cost attributed to the other material-intensive pricing data. Since Mr. Stratton's per-service-call price of

$31.97 did not take account pricing data for lawn maintenance, the inclusion of lawn maintenance as a service call would compromise plaintiff's overall damages scenario.

The enormity of this problem can be demonstrated by comparing the total number of 20,548 service calls for which plaintiff seeks compensation against the 7,164 "lawn maintenance service calls" for the period April 1981 to October 1982. This item alone accounts for 35 percent of the total claimed excess compensable service calls, yet the Stratton analysis did not pretend to take account of the obvious fact that the cost of labor and materials for lawn mowing would be less than for the service calls requiring the repair of air conditioners and the like.

This problem can be adjusted for in two ways. One is to exclude the 7,164 calls, plus some number to reflect five months of calls that were recorded in the Service Call Register and that have not been culled from the total. (It also appears from Mr. Oyer's testimony that 122 entries are in the register for April and May 1981.) The other is to adjust Mr. Stratton's hourly wage, material, and travel figures to take into account the probable labor cost, materials, and time expended for lawn mowing. The latter approach is rejected summarily, since it would be wholly speculative. There is no evidence to support the supposition that Mr. Stratton's lowest rate for maintenance employees, which he used to calculate travel time, would be applicable. Although there is some indication that gas and oil were used for lawn mowers, the court could not begin to guess the quantity or price. There was no testimony to indicate the average time for lawn mowing or even the size of the typical area that was included within one work order. Plaintiff's claim for lawn mowing also jeopardizes the validity of the 15–minute travel time, since the weekly lists of lawns to be mowed reveal that the lawns were grouped within the same areas. In summary, it is found that even if work orders for lawn mowing were to be considered service calls under the contract, the record would be of no assistance in adjusting Mr. Stratton's

wage/time/material/travel time unit price to account for them. Excluded from both the compensable total number of service calls, therefore, are 7,164 lawn maintenance service calls. Plaintiff's exclusion of this work from the pricing of service calls was correct.

### 2. *Exclusion of service calls for which plaintiff has been compensated*

■ Discovery revealed that plaintiff had failed to cull from the claimed compensable excess service calls those calls for which it had been compensated by one of the many modifications to the contract or that were otherwise excludable pursuant to the stipulation. Plaintiff sought to correct for any such deficiency by retaining Touche Ross and Mr. Oyer to verify the service call count and service call cards used in Mr. Stratton's pricing analysis. Mr. Oyer also was tasked to verify the counts for the lawn maintenance work and the total deductions representing calls for which plaintiff had been compensated. He is responsible for the 43,388 count from the Service Call Register, which was the product of giving each entry a consecutive number by a stamp numbering machine.

Mr. Oyer performed three verifications of the service call count that was used in the Stratton pricing analysis. First, he tested entries in the Service Call Register by an attribute sample, *i.e.*, testing to see whether an item belonged in or out. The second verification was a consistency check between a sample of the service call cards and entries in the Service Call Register. For the third verification, Mr. Oyer sampled the 7,532 service call cards used in the pricing analysis to assure that they were properly included or excluded. Based on these tests, Mr. Oyer gave his expert opinion of 99 percent confidence that the error rate was 2 percent or less. Mr. Oyer's report, however, did not verify the accuracy of Mr. Stratton's $31.97 price for service calls; rather, Mr. Oyer focused on the service call cards used, which in his view related to "certain aspects of the development of that figure."

Plaintiff, through Mr. Kirchdorfer, had taken the position that performance of multiple tasks in the same trade by the same maintenance employee as a result of the same request for service was recorded in the Service Call Register as one service call. Thus, in testing the Stratton analysis and the Touche Ross verification that the sample service call cards reflected compensable excess service calls, defendant probed as to whether this type of service call had been recorded correctly. Defendant introduced several Service Call Registers from July and August 1981 and for the week of January 25–30, 1982, which disclosed few instances in which plaintiff had followed through with the correct recordation for this type of service call. These registers also revealed a significant number of calls, exceeding 10 for the month of July 1981 and 20 for the month of August 1981, in which the same tradesman performing multiple functions in the same trade at the same residence as a result of the same call was listed as performing individual service calls. In the January 25–30, 1982 exhibit alone, there were at least 17 discrepancies out of approximately 400 service calls, which exceeds Mr. Oyer's 2–percent error rate. Plaintiff was advised that the court's own review of the exhibits yielded this result, and was afforded the opportunity to review the entries to show that either there were no discrepancies or fewer discrepancies. Plaintiff did not pursue this opportunity.

It is true that a valid statistical projection cannot be assigned to the data in the Service Call Register that defendant chose to introduce. Yet, there was no indication that these registers were other than randomly chosen, and the type of discrepancies was consistent. Mr. Oyer had been provided with detailed lists, by month, of all items that should be excluded from the total number of service calls for purposes of calculating plaintiff's claim. In response to a court question, and borne out by the Touche Ross report, Mr. Oyer agreed that because this type of service call was not identified to him as one that should be culled, he did not test to see whether there were any discrepancies on point. Given this background it must be found that Mr. Stratton's analysis failed to exclude multiple-task service calls within the same trade and that the number is not insignificant.

Since plaintiff's data are defective, a reduction of compensable service calls must be made. The court has assigned a figure of 10 percent, which takes into account several problems with plaintiff's damages analysis. First, the ramifications of the failure to exclude multiple-task one-trade service calls are unknown, as the exhibits only suggest its potential. Moreover, Messrs. Stratton and Oyer were not able to testify whether certain service calls associated with air conditioning problems that were due to low water flow, for which the Air Force paid plaintiff under a separate modification, were not double-counted as compensable air conditioning service calls.

The 10–percent reduction also recognizes that some service calls included in the 43,-388 total were inherently improbable. For example, on January 29, 1982, 12 service calls for painting exterior doors to adjacent units were recorded with a duration of between five and seven minutes each. This type of entry is not aberrational in the few Service Call Registers introduced by defendant. It also does nothing to support the reliability of plaintiff's 15–minute travel time allowance. The 10–percent reduction allows for the fact that 15 minutes may be a reasonable allowance for travel time, but not a fair average. Finally, the 10–percent deduction takes account that residential lawn mowing calls were listed in the Service Call Register for five months during the beginning of the contract and 122 were listed for April and May 1981, thereby inflating the total number of entries. Since the lawn maintenance work was at least 500 per month, based on plaintiff's claim for 14 months totalling 7,164 calls, approximately 2,600 such calls were recorded in the Service Call Register. Given these problems, a 10–percent reduction of 4,339 from the total register count ser-

vice calls is reasonable and justifiable.[7]

### 3. *Double-counting for mark-up on material, labor overhead, and labor costs*

■ Mr. Zaremsky identified some troubling problems with plaintiff's pricing methodology. The first problem concerns the 30–percent mark-up for material costs, coupled with the overhead rate that plaintiff gleaned from the 1980 DCAA audit. Mr. Stratton explained that 30–percent rate would include costs of handling, yet the inventory clerk was included in labor overhead. Mr. Zaremsky also faulted Mr. Stratton's analysis for not taking account of a decreasing overhead rate applicable to the increased personnel utilized by plaintiff, since the overhead rate likely would decrease as more personnel were employed. Yet, this second problem has a smaller impact because Mr. Kirchdorfer testified that he overmanned the job at the outset in anticipation of surplus service calls (before the DCAA audit) and that these individuals remained on the job site even after the surplus work was completed.

Mr. Zaremsky also pointed out that by Modification No. 8, executed on September 29, 1981, a Service Contract Act wage adjustment reimbursed plaintiff for a portion of its increased labor charges. Defendant's expert is wrong on this point because the labor rates utilized by Mr. Stratton were drawn from data proposed by the contractor on October 1, 1980, in connection with the DCAA audit, and the modification was executed over a year later. Thus, the older data contained in the audit report, which formed the basis for plaintiff's average labor costs per service call, were not inflated by the later wage adjustment.

Mr. Zaremsky was not cross-examined, and neither Mr. Stratton's report or the latter's testimony accounts for or responds to Mr. Zaremsky's observations on the 30–percent mark-up for unreimbursable material. Plaintiff emphasizes that the DCAA audit recognized the overhead rate that plaintiff seeks to employ and that the Air Force's pre-bid estimate for this contract utilized a 30–percent mark-up for unreimbursable material. These are indicia of reliability; however, they do not bind the Air Force to utilize these rates in respect of every claim under the contract, and they do not answer this instance of double-counting.

Plaintiff failed to counter or respond to testimony supporting a claim of double-counting. Plaintiff's cost for service calls has been reduced by 5 percent, or $1.60 per call, to account for the foregoing problems with mark-up, and, to a lesser degree, the overhead rate.[8]

### 4. *The dumpster materials*

■ Although it was established that plaintiff's inventory system would not have included materials that came from the dumpster, Mr. Kirchdorfer did distribute this material to his tradesmen. As he testified, "[w]hatever the cost of that material was, it lowered my cost on this contract for that amount." The cost to the Air Force was not increased correspondingly, if plaintiff's employees did not list the dumpster materials on the service call cards. Mr. Stratton's testimony established that all material listed on the service call cards were assigned control numbers and traced to invoices containing the suppliers' names and item prices. The dumpster materials thus were not included in the service call cards utilized by Mr. Stratton. There is no basis for reducing plaintiff's price per service call to account for this benefit.

### 5. *Calculation of damages*

The adjustments discussed above yield the following results: The number of com-

---

**7.** Defendant did not attempt to quantify these problems, taking the approach that their existence rendered plaintiff's damages analysis speculative and unreliable and therefore ushered in defendant's modified total cost methodology. The problems that have been discussed do not undercut plaintiff's proof as much as defendant suggests, since the Stratton analysis is theoretically sound and overall reasonably accurate if lawn orders are excluded. The 10–percent reduction is made based on the court's review of the evidence in the absence of any attempt by plaintiff or defendant to define the impact of these problems.

**8.** *See supra* note 7.

**614**

pensable excess service calls excluding from the 43,388 Service Call Register entries the 9,395 service calls that plaintiff takes the position were excludable under the stipulation and the 665 service calls that were withdrawn by letter of December 13, 1987, is 33,328. The 10–percent reduction for the problems with the total service call count and other aspects of plaintiff's damages analysis discussed above lowers this number by 4,339 to 28,989. The 19,944 service calls called for by the contract are deducted, leaving 9,045 excess compensable service calls. Plaintiff's service call unit price has been reduced by 5 percent from $31.97 to $30.37 based on the problems discussed above. Applying this price to the total compensable excess service calls yields $274,696.65.

## CONCLUSION

It is found and concluded that plaintiff sustained damages in the total amount of $274,696.65 due to defendant's breach of contract. The Clerk of the Court shall enter judgment for plaintiff in the amount of $274,696.65, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 611 (1982), from September 24, 1982.

IT IS SO ORDERED.